THE STATE v. HAINES, Appellant.

Division Two, March 12, 1901.

1. **Continuances:** THREE TERMS WITHOUT TRIAL: DISCHARGE. The statute providing for a discharge of a prisoner who has not been brought to trial before "the end of the third term after the indictment was found," means that there must be three continuances on the application of the State, not including the term at which the indictment was found.

2. ————: ————: LACK OF TIME: NO ENTRY. In such terms, can not be counted those in which the court continued the case for lack of time to try the case. And if the record is silent as to why a case was not tried, it will be presumed that it was continued because of a lack of time to try it.

3. **Evidence:** REPUTATION OF DEFENDANT. One who knows nothing of defendant's reputation in the city where he lived or in that where the crime was committed, is not a competent witness to testify to his reputation as a peaceable, law-abiding citizen.

4. **Instruction**: DELIBERATE: MURDER IN SECOND DEGREE. Where the jury finds defendant guilty of murder in the second degree, error in defining "deliberate" can avail defendant nothing.

5. **Culpable Negligence**: DEFINITION. Where the defense to a charge of murder is based on "culpable negligence," words which make much plainer the meaning of those words than the mere use of the words themselves would, do not render the instruction erroneous.

6. ————: COUPLED WITH SELF-DEFENSE. Where defendant mixes up his testimony by stating that he shot deceased in self-defense, and also that the shooting was accidental and due to the deceased's attempt to take a pistol from him, which he had without any legal excuse drawn on him, the trial court is not to be condemned for instructing on both theories of defense, nor can the defendant complain that such was done.

7. **Homicide**: TAKING LAW INTO ONE'S OWN HAND. Defendant stated that he killed deceased because he robbed him. There was no evidence of the truth of the charge, but even if true, the law does not permit one to take the law into his own hands and avenge a fancied or real wrong.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford,* Judge.

AFFIRMED.

*Marcy K. Brown* and *Ralph S. Latshaw* for appellant.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1) Applying the provisions of the statute to the facts as contained in the record, it will be readily observed that no error was committed by the court in overruling the defendant's application for a discharge. State v. Steen, 115 Mo. 474; State v. Copeland, 65 Mo. 497; State v. Ware, 145 Mo. 186. (2) No objection was made to the introduction of this testimony on the part of the defense, and no exceptions likewise

saved. Not having been called to the trial court's attention, though the testimony may have been improper, yet the matter can not now be gone into because the trial court's attention was not specifically called thereto, and he was given no opportunity to refuse the introduction of the testimony objected to. (3) The objection is made that the court gave an erroneous instruction upon the question of murder in the first degree, but it has been quite well settled in this State that a case will not be reversed because of an erroneous instruction upon a higher degree of the offense than that for which defendant was convicted. Having been convicted of murder in the second degree upon a competent instruction, it does not stand defendant in hand to complain of an erroneous instruction upon murder in the first degree. State v. Bulling, 105 Mo. 205; State v. Ellis, 74 Mo. 207; State v. Nelson, 88 Mo. 126; State v. Stockwell, 106 Mo. 36; State v. Anderson, 89 Mo. 312.

GANTT, J.—The defendant was indicted at the January term, 1899, of the criminal court of Jackson county at Kansas City. He was duly arraigned, and declining to plead, the plea of not guilty was entered of record for him.

The record of said January term recites that for want of time to try the case it was continued to the April term. No entry was made of record in the cause at the April term, 1899. On the application of the State the cause was continued at the September term, 1899. The defendant was put upon his trial at the next or January term, 1900, and was convicted of murder in the second degree. From the sentence on that conviction he has duly appealed to this court.

The facts attending the homicide are substantially as follows. For seventeen years or more prior to January, 1899, the defendant had been a railroad ticket-broker on Union avenue, opposite the Union Station at Kansas City, Missouri.

He is about sixty years old, and had borne a good reputation as a peaceable, law-abiding citizen. About three years prior to the homicide he had removed to Topeka, Kansas, and made that city his home, but was in the habit of making frequent visits to Kansas City, Missouri. On the eighteenth of January, 1899, he left Topeka and arrived at Kansas City at 5:15 p. m. He attended to his business, and it seems, intended to return home on a train leaving Kansas City at 9:30 that evening. He reached the station too late for his train, and was compelled to wait until 2:30 that night, or rather the following morning. Having all this idle time at his disposal he went to the New Albany Hotel and the various ticket offices in that neighborhood, and spent his time with acquaintances until about midnight. About midnight he appeared in a saloon owned by one Caldwell. Charles D. Watson, the deceased, was the bartender in this saloon.

The coroner, Dr. Lester, and Dr. Langsdale, a former coroner of Jackson county, were summoned that night, and testified that when they reached Caldwell's saloon they found Watson dead. His body was still warm. They made an examination of the body and found he had been shot through the heart by a bullet. The wound was a necessarily fatal one. It entered about the sixth rib, a little to the left of the median line, and a little to the right of the nipple line, penetrated the chest, through the apex of the heart. They extracted the bullet, which proved to be a 38 calibre. According to their testimony the bullet went in and through nearly on a level. There was little or no obstruction. In their opinion death would not necessarily be instantaneous. In many similar cases the wounded man has been known to walk or run quite a distance. The shot would not affect his mind. Deceased was a stout man, weighing perhaps, 160 pounds, and apparently about 42 to 44 years old. They searched his person in the presence of

the policeman and found no weapons on his person.   They ex-amined the drawers in the saloon and found two pistols in one drawer, one broken and the other in a fair condition.   Neither had been discharged recently.   Both of these surgeons testi-fied the deceased had on a linen or duck apron, and the powder-burn and hole in it indicated that the pistol was held in a few inches of his person when he was shot.   Deceased had only about 60 or 65 cents in money on his person.

Caldwell, the proprietor, testified that when he left the saloon early in the evening, the cash register had about $15 in it, and soon after Watson was killed he counted the cash in it and it contained about $28, all in silver change.   There were no $10 or $20 bills in it.   He came back to the saloon at 11 o'clock that night, and Watson, the bartender, was perfectly sober.   The defendant came in about 11:30.   King, Curtis, Rohring and Vickers and perhaps others were in the saloon when defendant came in.   Several were playing cards at a table.   Defendant spoke to Watson, and then went over to the card table and wanted to get into the game.   He then came back to Watson and Caldwell and asked the latter to shake dice with him and Caldwell refused, and Watson told him to go and sit down.   He then asked Rohring to shake dice for a dollar, and Caldwell refused to allow it.   He then asked Wat-son if his credit was good, and Watson said yes, but that he— defendant—had enough.   He had better go and sit down.   He then sat down by the stove, and some one told him it was too hot there.   He then became sick and went back to the toilet and vomited.   Caldwell went out and got some sandwiches and he and Curtis and Watson ate them.   Defendant was then in the closet.   This witness left the saloon at 12:30, and didn't see defendant any more until after the killing.   Witness lived in the building.   He was summoned soon after the shooting and when he came in, he found officers Keenan and Daily there.

One of them had defendant, and Watson was lying on the floor, and just then a doctor Chappell came in and pronounced Watson dead. He inquired in the presence of defendant what Watson was shot for, and the policeman said, "this fellow says that he robbed him." Curtis was living in Idaho at the time of the trial, and King was out of the State.

Vickers, a mail clerk on the Missouri Pacific Railroad, was playing pitch with Rohring, King and Curtis, when defendant came in. Defendant was intoxicated. He came up behind Rohring, took hold of his cards and asked him to let him play his hand for him. He mussed the cards up, and then bantered Rohring to play them for so much. Then he straightened up and said he didn't have a cent. He looked at Watson, the deceased, and said, "Is my face good?" and Watson answered, "You bet it is." Defendant laid his overcoat on a chair and then went back to the closet. Watson came round and took his overcoat and hung it up for him. Witness joked Watson about his friend (the defendant) and Watson said he was sleeping all right and he would wake him, he wanted to go off on the Santa Fe road. Witness then went up stairs and went to bed.

Bray, a police officer, testified. He was summoned when Watson was shot and ran immediately to Caldwell's saloon, about two blocks distant. When he reached the place he found officer Keenan there. The defendant was sitting in a chair next to the stove with Keenan two and one-half feet from him. King was standing talking to Keenan. Bray asked King who shot deceased. He said Haines (the defendant) came out of the wine room and accused Watson of robbing him, and that he shot him. Witness said, "I says to Haines, 'What did you do this for?' He said, 'He robbed me.' I told officer Keenan to take defendant to No. 2 police station."

King also said, "Haines came out of the wine room and

State v. Haines.

said to Watson, 'You have robbed me. I want my money back,' and thereupon Bray said to Haines, 'What did you do that for?' and defendant answered, 'He did rob me.' "

Officer Nat Daily testified that he was on his beat about 10 minutes before 2 a. m., January 19th, waiting to send in his report at 6 minutes to 2 o'clock, when he heard the report of a pistol, when Curtis ran out of Caldwell's saloon and cried, "Police." Whereupon Keenan and witness immediately ran into the saloon and found defendant on the floor outside of the bar, holding a revolver in his right hand, which he was trying to point, and deceased, Watson, on or over him, holding down his pistol hand. The officer immediately took the pistol from Haines, the defendant, and said to Watson, "Charley, get up," at which deceased attempted to rise, but fell over dead. When witness came Haines said, "That fellow robbed me and I shot him."

This witness testified that the body of deceased was guarded and no money or other thing was taken from it until turned over to the coroner.

During the cross-examination of this witness he was asked by counsel for defendant: "What amount did they (King and Curtis) say Haines claimed he had been robbed of? A. $30."

The prosecuting attorney thereupon said, "If counsel calls for part of that conversation we have a right to call for it all."

Later on, the prosecuting attorney, referring to this conversation, inquired what King and Curtis said that time about the $30, and the witness answered, "They said Haines came in and told Watson two or three times that he had robbed him, and if he didn't give him back his $30 he would kill him."

Counsel for defendant, without assigning any reason

therefor, moved the court to strike out this answer, which the court overruled.

Witness also testified that defendant not only stated, "I shot him because he robbed me," but said also, "My watch is gone;" to which witness replied, "No it isn't, your watch is there, Jack; the ring is pulled out," and took his watch and put the ring back in it.

Sanford, a reporter of the "Star" newspaper, testified that next morning after the homicide, he went to the police station and saw defendant. He was not in a cell, but sat in a hallway. He asked him about the affair. He was greatly disturbed. He told witness he had been out the day before to collect some rents. He got $10 from Jack Daily and there was another item of $15, and he said he had $5 in his pocket; that he had been drinking; that his recollection was he had $25 in bills and some change when he went into the saloon. He went into a back room and went to sleep. When he awoke his money was gone and his watch was gone and the chain twisted loose; that he went out and demanded his money of the bartender; that his overcoat was gone, and he wanted both. "He said he had shot somebody."

Rohring testified he was a brakeman on the Missouri Pacific. His train came in at 10:30 and as next day was pay day he slept over the baggage room at the station that night. He was in the saloon when defendant came in after 11 o'clock and left there at 1:30 to go to sleep.

He corroborated what Caldwell and others stated about defendant's desire to play dice for $1 and the refusal to play with him; that he went into the closet and afterwards came out and asked Watson for $30 and Watson jokingly answered, "You ought to have $30," or, "I don't blame you for wanting $30." Watson introduced him to Caldwell as "Hank's son," and he said he didn't know Hank had a son.

Other witnesses corroborated the version given by the foregoing witnesses for the State.

On the part of the defendant there was evidence that during the night and before the homicide, defendant was seen to have $25 or $30 in his possession, which he counted over at the saloons and that he played at dice with a hackman. A number of witnesses testified to his general reputation as a law-abiding, peaceful man.

Defendant testified at great length to the circumstances attending the homicide. Leaving off his various trips about the city and meetings with different acquaintances, with whom he drank, he details the occurrences in the saloon, where the killing took place, about as follows:

He went into the saloon about 11:30 or 11:45. He knew Watson, the deceased. He found a social game of cards going on and tried to get into it but couldn't and proposed to throw dice for a dollar but Caldwell and Watson would not permit it in the saloon. He became sick at his stomach, and went back to the closet in the rear and vomited. Watson came to him and got him to go into a small wine room and offered him a drink to brace him up, but he didn't take it. Watson told him to sit there and sleep and he would wake him for the 2:30 Santa Fe train. He says he slept awhile and waked up and found his pocket had been rifled. He went into the saloon and told Watson his money was gone. Watson inquired how much he had, and he said about $30. Watson said, "That's all right, Jack," and thereupon defendant returned to the wine room to sleep but was restless and came out again and said to Watson, "Charley, I guess I'll take my money and go over to the depot and wait till the train is ready to go out." Watson asked what money he was talking about. Defendant said the $30 he had spoke to him about. Watson then said, "It was customary for bums to come in and sit around and then claim they had been robbed in the place."

Defendant says he argued with him to try to get him to see that his money was restored.

He says Watson gave him his overcoat and that his revolver was in the outside overcoat pocket.

After arguing with Watson he went out into the air, undetermined what to do. He concluded to go back and see Watson again.

He says he stood in the middle of the room. Watson told him to "ring off about losing money, he didn't believe he had any money." He went out and came in again and started behind the counter. He says Watson seemed to be infuriated and came from behind the bar and rushed at him, and struck him in the face with something harder than his fist. He thought it was an ice pick. He says Watson called him a "s-n. of a b-h" and ordered him out. As Watson struck him he reached into his overcoat pocket and pulled out his pistol and drew it to keep Watson off of him and to defend himself. Watson struck at him again and caught at the barrel of the pistol and knocked defendant down, and as he fell Watson jumped onto him, and seized the pistol. While struggling for the pistol it accidentally went off, the bullet striking Watson. Defendant testified he was 57 years old.

I.   The first ground urged for a reversal of the judgment in this case is the refusal of the court to discharge the defendant because he was not brought to trial before the end of the third term after the finding of the indictment, as required by section 2644, Revised Statutes 1899.

The indictment was returned into open court on January 24, 1899. The plea of not guilty was entered January the 30, 1899. On March 25, 1899, the cause was continued for want of time to try the case. At the April term no entry appears as to the disposition of the case.

At the September term it was continued for cause shown,

on the application of the State.    At the January term, 1900, the prisoner was tried.

Section 2644, Revised Statutes 1899, must control our decision, as three regular terms of the criminal court were required to be held in Kansas City in each year.    That section provides that "in all cities or counties in which there shall be more than two regular terms of the criminal court, the defendant shall not be entitled to be discharged for the reasons and under the circumstances mentioned in section 2641, *until the end of the third term after the indictment was found."*

This language, "after the indictment was found," has been practically the same in all the revisions since 1845.    It was construed in Robinson v. The State, 12 Mo. mar. page 592, as not including the term *at* which the indictment was found.    With full knowledge of the construction placed upon those words by the Supreme Court, the General Assembly has continued their use up to and including our last revision.    Excluding, then, the January term, 1899, the prisoner was brought to trial and convicted before the end of the third term after the indictment was found, and consequently no error was committed in overruling his motion for a discharge.

Moreover, it appears that only one continuance was granted on the application of the State; and it must be considered as settled law in this State that in the construction of these sections providing for a discharge that they "were intended to operate only when there is some laches on the part of the State."    [State v. Huting, 21 Mo. 464; State v. Marshall, 115 Mo. 383; State v. Billings, 140 Mo. 193.]

Continuances ordered by the court of its own motion for want of time to try a case, or mistrials of the case, have never been held to authorize a discharge.

The silence of the record at the April term is the only circumstance upon which the defendant could have based his

motion for discharge, but as was said in State v. Marshall, 115 Mo. 388, in the absence of proof to the contrary, it must be presumed that the case was continued for want of time to try it.

II.    Much stress is laid upon the admission of the evidence of police officers Bray, Dailey, and Keenan as to statements made immediately after the shooting and in the presence of defendant and the dying man, by Curtis and King, as to the shooting.

No objection was made to this evidence at the time and no exception saved, and it is too late to make the objection for the first time in this court, and this point must likewise be ruled against the defendant.

III.    Mr. W. B. Clark was offered by defendant to prove his general reputation as a peaceable, law-abiding citizen. Having testified that he had not seen defendant for five years; that witness lived in Independence, Missouri, and defendant in Topeka, Kansas, and that he couldn't state as to defendant's reputation in the neighborhood in which defendant resided before moving to Kansas, upon objection of the prosecuting attorney he was not permitted to testify to defendant's general reputation.    Unquestionably no error was committed in excluding this testimony.    The witness clearly disqualified himself.    He did not know the general reputation of the defendant as a law-abiding citizen either in Topeka, where he had lived for three or four years, or in Kansas City.    Neither was any cross-examination of defendant permitted as to matters concerning which he had not testified.

IV.    Various criticisms have been made on the instructions given by the court.    We proceed to examine these in the order of the brief of defendant.

The instruction defining the word "deliberate" is challenged as error, but as the jury found the defendant guilty of

State v. Haines.

murder in the second degree, even if the court erred in that regard it can avail defendant nothing on this appeal. This has been ruled again and again. [State v. Eaton, 75 Mo. loc. cit. 591; State v. Sansone, 116 Mo. 1.]

Neither was the instruction for murder in the second degree dependent upon that defining murder in the first degree.

The court gave the following instruction:

"The court instructs the jury that if you fail to find a verdict according to law as declared in instruction number two, but shall find from the evidence that the defendant, John R. Haines, at the county of Jackson and State of Missouri, did at any time before the twenty-fourth day of January, 1899, feloniously, premeditatedly, on purpose and with malice aforethought, with a certain revolving pistol, and that the same was a deadly and dangerous weapon, shoot and kill Charles D. Watson, you will find the defendant guilty of murder in the second degree, and assess his punishment at any time in the State penitentiary, not less than ten years."

It is not pretended that there was error in defining the words "premeditatedly" "wilful" and "aforethought."

The court defined them as they have been by this court time out of mind, and so was "malice."

V. No complaint was made in the motion for new trial of the giving of instruction numbered 4, given by the court of its own motion, which permitted the jury to find defendant guilty of manslaughter in the fourth degree if he shot and killed deceased without malice, but in a heat of passion produced by a blow and opprobrious epithets.

But complaint is made of instruction numbered 5, which is in these words:

"The court instructs the jury that if they fail to find a verdict according to the law, as declared in instructions numbered 2, 3, or 4, but shall find from the evidence that the de-

fendant, John R. Haines, at the county of Jackson and State of Missouri, at any time within three years next before the twenty-fourth day of January, 1899, drew a pistol upon Charles D. Watson, without legal excuse therefor, and that said Watson seized said pistol and tried to take it from the defendant, and shall further believe that a struggle ensued over the possession of the pistol, in which said pistol was accidentally discharged and killed said Watson, then you should find the defendant guilty of manslaughter in the fourth degree and assess his punishment as defined in instruction numbered 4."

The defendant prayed the court to give an instruction numbered 2, which is as follows:

"If the jury believe from the evidence that there was an altercation or quarrel between the defendant and the deceased, Charles D. Watson, in which the defendant drew a pistol upon said Watson, without legal excuse therefor, and that the deceased seized the defendant's pistol and undertook to take defendant's pistol away from him, and shall further believe that there was a struggle between the two men over the possession of the pistol, and in such struggle the pistol was discharged by accident and killed the deceased, then you shall find the defendant guilty of manslaughter in the fourth degree and assess his punishment by imprisonment in the penitentiary for two years or by imprisonment in the county jail not less than six months, or by a fine not less than $500, or by both a fine not less than $100 and imprisonment in the county jail not less than three months." Which the court refused, defendant then and there excepting.

It is evident that the court refused defendant's instruction because it modified it and then adopted it. The error, if any, was invited by defendant, and he has no ground to complain.

It is, however, strenuously insisted that this instruction

does not define manslaughter resulting from culpable negligence. We think it does. It was not at all necessary to use the words "culpable negligence;" on the contrary, it was made much plainer to the jury by telling them what facts would amount to such negligence.

In State v. Emery, 78 Mo. 77, this court announced the doctrine, that in order to find a person guilty of manslaughter in the fourth degree under section 1834, Revised Statutes 1899, it was sufficient to show that the shooting though unintentionally done was the result of negligence in handling the firearm in such a manner as indicated a carelessness or recklessness of human life.

We agree that outside of defendant's own evidence there was nothing on which to base this instruction, but taking that as true it placed him in the attitude of drawing a revolver upon deceased, "without any legal excuse," and if in his effort to prevent being shot by defendant, deceased endeavored to take the revolver from him and was shot, the fault is directly traceable and referable to the illegal and culpably reckless act of defendant. Certainly this is the mildest view that can be taken of his conduct at the time.

We fully appreciate the situation in which the trial court was placed under the evidence of defendant. Contending one moment that he shot deceased in self-defense, and the next that it was wholly accidental, it was not easy to say what the defense was, but when the court instructed upon both theories and left the jury to determine the fact, it is clear no harm resulted to defendant by reason of the court's giving him the benefit of either, as it might appear to the jury.

The other instructions having been so repeatedly approved, no good purpose can be subserved by incumbering the record with a minute description of each.

As to the point that the evidence was insufficient to sustain

the verdict, we think it is clearly not tenable. The whole disturbance in that saloon originated in the wrongful acts of defendant. There was no evidence that he had been robbed by deceased or any one else in that saloon. Granting that as a result of his evening carousal he had lost his money, he himself furnished the evidence that he had abundant opportunities to have lost it before he went into Caldwell's saloon. The evidence was ample from which the jury could have found that, smarting under the impression that he had lost his money in Caldwell's saloon, he had determined to force the deceased to restore it or·kill him. His statement that he had killed him because he had robbed him was corroborated by the facts.

The law will not permit one to thus take the law into his own hands and avenge a fancied or real wrong.

He made no complaint to the officers of the law whom he met after the occurrence, several of whom were on duty in the immediate vicinity at the time.

Upon a review of the whole record we find no reversible error, and the judgment must be and is affirmed.

*Sherwood, P. J.,* and *Burgess, J.,* concur.