THE STATE v. RALPH PIERSON, Appellant.—123 S. W. (2d) 149.

Division Two, December 20, 1938.*

*NOTE: Opinion filed at May Term, 1938, August 17, 1938; motion for rehearing and transfer to Court en Banc filed at September Term, December 20, 1938.

*Walter N. Davis* for appellant.

846

*Roy McKittrick,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

WESTHUES, C.—Appellant, Ralph Pierson, and Robert Cotham and Andrew B. Meadows were indicted on April 4, 1930, on charges of murder in connection with the burning of the Buckingham Hotel Annex in the city of St. Louis, on December 5, 1927. Seven persons were known to have lost their lives in this fire, and eight indictments were returned, seven for murder and one for arson. Appellant asked and was granted a severance in all of the cases. He was tried in February, 1931, on an indictment charging the murder of May Frazer, was convicted and received the death penalty. From the sentence imposed he appealed. That case reached this court in due time and on December 14, 1932, the judgment of conviction was reversed and the case remanded for retrial because of improper cross-examination of appellant and improper argument to the jury by the prosecuting attorney. [See State v. Pierson, 56 S. W. (2d) 120, 331 Mo. 636.] A second trial was had upon that indictment at the April Term, 1933. Appellant was again convicted, but at this trial he received a life sentence from which he appealed. On July 11, 1935, this court reversed that judgment and remanded the case for retrial. That judgment was reversed because during the trial appellant was denied the right to impeach a material witness whose evidence, given at a previous trial, was read to the jury. Appellant attempted to show that this witness, at the time she gave the testimony, was suffering from *dementia praecox*. The trial court refused this offer. [See State v. Pierson, 85 S. W. (2d) 48, 337 Mo. 475.]

For some reason the State did not elect to try appellant a third time upon that indictment, but selected the indictment which charged appellant with the murder of Joseph J. O'Brien, who lost his life in the same fire as May Frazer. This trial began on May 19, 1936,

848

and was concluded on May 26, resulting in a conviction of appellant and a sentence of life imprisonment. From this sentence appellant has taken this appeal. Appellant's motion for a new trial contained forty-five separate assignments of error, many of which were briefed. There are a number of duplications, and we will therefore dispose of the questions briefed without referring to the assignments by number. At the outset, and before stating the facts and discussing the assignments of error pertaining to the trial of the case, we will consider a number of preliminary questions which have been preserved for our review.

■ Appellant filed an application for a change of venue, alleging that the Honorable Judges Williams, Connor, Joynt and Baron were prejudiced against him. The case was tried by the Honorable James M. Douglas. Appellant does not contend that Judge Douglas was prejudiced against him. Section 2127, Revised Statutes 1929 (Mo. Stat. Ann., p. 2682), provides in part, that when prejudice exists as to any two of the judges a change of venue *may* be allowed to some other circuit court. Section 2130, Revised Statutes 1929 (Mo. Stat. Ann., p. 2683), provides as follows:

"After said first Monday of January, 1897, changes of venue shall be allowed from said circuit court in any criminal case pending therein, for any cause for which such changes are or may be allowed from other courts of this state having criminal jurisdiction; but whenever such changes are asked on the ground of prejudice, interest, or other legal objection to any of the judges thereof who may have been assigned for the trial of such case, no change shall be awarded, but the case shall be transferred to another division of said court, to which the trial and disposition of criminal cases may have been allotted by the court." Since the case was transferred to a division of the court presided over by a judge who was not charged with prejudice, the appellant's rights under the statute were protected and the point is ruled against him. In the case of State v. DeShon, 68 S. W. (2d) 805, 334 Mo. 862, this court reviewed at length the right of a defendant to disqualify all of the judges of that circuit, three in number. It was held that he was not entitled to do so.

■ Appellant filed a motion seeking a discharge under the provisions of Sections 3696-3699, providing that if a defendant is not brought to trial within a certain number of terms of court he shall be discharged. Prior to the first trial appellant had been granted a number of continuances in all of the cases pending against him. During the time the case in which appellant had been convicted was pending on appeal to this court, the other indictments lay dormant in the circuit court. They were not upon the court docket or the clerk's docket. The second appeal was disposed of by this court on

July 11, 1935. The parties filed a stipulation here disclosing what occurred with reference to the cases which lay dormant after the second appeal was disposed of by this court. The stipulation reads in part as follows:

"Mr. Sullivan: It may be further stipulated, and is agreed by Mr. Lacy and the State, that when this case was set, or this series of cases were set in the June Term, 1935, they were continued by the defendant upon his application. The case has been set each Term thereafter, at which time they have been continued for the defendant upon his application. We desire it to be stipulated, and it is agreed by Mr. Lacy, that it may be stipulated that at no time has the defendant asked this case be placed on the trial docket of this court; at no times other than the times which appear of record, has the defendant or has the State requested that the case be placed or set on the trial docket of the court; that each time the case has appeared on the trial docket of this court, a continuance has been sought and received by the defendant upon his application; at no time has the State sought application or sought continuance, received one, or asked for a continuance of these cases."

We must consider this question in light of the fact that all of these indictments grew out of the same alleged act of arson, that is, the burning of the Buckingham Annex. We find in the record that whenever the cases were on the docket for trial the State was insisting upon a trial and the defendant was asking for continuances. The cases lay dormant only after appellant had been convicted on one of the indictments and his appeal was pending in this court. The purpose of the statute is to prohibit a person from being held in jail, or on bail, without a speedy trial. The Constitution guarantees a speedy trial for a person charged with crime, and the statute, above referred to, was evidently enacted in view of that constitutional provision. In State v. Nelson, 279 S. W. 401, l. c. 403, this court in speaking on this subject said:

". . . the reason of the law being that, if the accused is ready and willing to put himself upon the country in answer to the charge preferred against him, he shall not be deprived of a speedy trial on account of the laches of the State. What constitutes laches within the meaning of these sections and the correlative section, 4041, has frequently been judicially determined. Paraphrasing the very excellent definition from our own cases of laches, as more particularly applicable to equitable proceedings, but which nevertheless is not inappropriate here, it consists in the failure on the part of the State to do that which in justice it should do in the prosecution of the accused to afford him such a speedy hearing and determination of the charge against him as is accorded by the Constitution. [Troll,

Admr., v. St. Louis, 257 Mo. 626, 168 S. W. 167.] Mindful of the rights of the accused, and also of those of the public, this court has held that, in considering whether a defendant is entitled to a discharge under these statutes, the bar cannot be invoked where the continuances were made by the court on its own motion; and, if the phrase 'on its own motion' were not a sufficient statement of the reason for same, the presumption would nevertheless obtain that the State was in no manner responsible for the delay in the trial thus occasioned. [State v. Marshall, 115 Mo. 383, 22 S. W. 452.] Likewise, when a record shows a continuance, in the absence of any proof to the contrary, it will be presumed to have been granted on grounds authorized by the statute. [State v. Haines, 160 Mo. 555, 61 S. W. 621.]''

It is evident from the record that these cases lay dormant with the consent of appellant. Consent to a continuance tolls the statute. [State v. Nelson, supra, and State v. Harp (En Banc), 320 Mo. 1, 6 S. W. (2d) 562.] In State v. Miller, 129 Pac. 1100, l. c. 1103 (4, 5), the Supreme Court of the State of Washington held that a defendant waived the statute if he waited until the case was set for trial before asking for a dismissal. Note what the court said:

''This court also held that even the mandatory statutory provision is waived by a failure to ask for a dismissal until just before trial. [State v. Alexander, 65 Wash. 488, 118 Pac. 645. See, also, State v. Seright, 48 Wash. 307, 93 Pac. 521; State v. Lorenzy, 59 Wash. 308, 109 Pac. 1064, Ann. Cas. 1912B, 153.]''

In the case before us the record discloses that at appellant's request the case was continued a number of terms after July, 1935, and *not until May, 1936, when he was compelled to go to trial,* did he file the motion for his discharge. We hold that defendant's right to a speedy trial has not been denied in this case and that he was not entitled to his discharge under Sections 3696-3699, supra, because by his own actions and conduct he waived the provisions of the statute. This holding is supported by our own cases, as will be noted in State v. Nelson, supra, and the following cases from other states: People v. Hayes (Cal.), 39 Pac. (2d) 213; People v. Romero (Cal.), 57 Pac. (2d) 557, l. c. 559 (8, 9); Gallagher v. People, 88 Ill. 335; Hunter v. State (Ariz.), 30 Pac. (2d) 499; Keller v. State, 185 N. E. 417, 126 Ohio St. 342. In Ex parte Tramner, 35 Nev. 56, 126 Pac. 337, l. c. 344, 345 (2, 3), the defendant was charged with double murder. He was not tried on indictment number two until he had been sentenced under indictment number one. The court in considering the question of waiver stated:

''To the second main contention of counsel that petitioner is entitled to his discharge under indictment No. 2, because he was not accorded a speedy trial, we can neither concur nor give him any

comfort, for the reason that the record does not disclose that the petitioner's rights in this respect were ever violated. This court has uniformly held that a continuance in a criminal case is within the discretion of the court, and unless there is an abuse of its discretion its actions will be sustained. In the present case we observe no abuse of discretion by the court which can be said to be prejudicial to petitioner's rights. [State v. Chapman, 6 Nev. 320; State v. Rosemurgey, 9 Nev. 308.] The stipulation of facts between counsel, cited heretofore, discloses that the petitioner interposed no objection to the continuance of the setting of the murder charge under the second indictment. Among other facts it is agreed in said stipulation that 'at the time of the making of the order by the judge of the Sixth Judicial District Court. Humboldt County, whereby indictment No. 2 was continued for further setting, the petitioner made no objections to the making of said order.' The fact that no objection was made by petitioner to the continuance and the order setting the case, and that the record does not disclose that he ever made an application for a speedy trial, or any trial whatever, on indictment No. 2, places him in a position wherein now he cannot complain. [Gillespie v. People, 176 Ill. 238, 52 N. E. 250; Dudley v. State, 55 W. Va. 472, 47 S. E. 285; State v. Keefe, 17 Wyo. 227, 98 Pac. 122, 22 L. R. A. (N. S.) 896, 17 Ann. Cas. 161.]''

So in this case, appellant, Pierson, made no objection that he was not being tried on the other indictments while his appeal was pending. On the contrary, even when no appeal was pending, and his conviction had been reversed a second time, the State was ever ready for trial and the defendant was seeking delay. In State v. Huting, 21 Mo. 464, this court held, ''the statute was intended to operate only when there is some laches on the part of the State.'' In this case the State at no time asked for a continuance. To have tried appellant on the other indictments while an appeal was pending from a judgment of conviction would have meant that the defendant would have been tried in seven separate indictments, causing him needless expense, worry and time, when one conviction would have been sufficient. It is evident that appellant's right to a speedy trial was not violated in this case.

Appellant complains that the trial court erred in denying his motion for permission to inspect the minutes of the grand jury for the purpose of determining what evidence certain witnesses gave before that body. This motion was filed on May 13, 1936, after the State had insisted on a trial of the case for many months. This was six years after the filing of the indictment. The witnesses had testified at three previous trials. In 16 Corpus Juris 801, section 2037, the general rule is thus stated:

"Leave to examine the minutes of the grand jury is not a matter of right, but whether defendant shall be permitted so to do is in the discretion of the court. . . ."

In People v. Strauss, 165 App. Div. 58, 150 N. Y. Supp. 991, the court held that such a motion, filed a year after indictment, should be denied. In People v. Levine, 291 N. Y. Supp. 1001, the court remarked that motions for inspection of grand jury minutes should not be encouraged when made on the eve of trial. [See, also, Steensland v. Hoppmann (Wis.), 252 N. W. 146; People v. Kramer, 270 N. Y. Supp. 902.] The record does not disclose any abuse of discretion on the part of the trial court. We may add that the opinion in the case of State v. Pierson, 337 Mo. 475, 85 S. W. (2d) 48, discloses that appellant in that case filed a motion to quash the indictment on the ground that it had been voted by the grand jury without hearing legal evidence. A hearing on that motion gave appellant ample opportunity to gain full knowledge of what transpired before the grand jury.

■ Appellant also filed a motion requesting the court to grant him a joint trial on all of the indictments, contending that only one felony was charged, since all of the charges grew out of the same alleged act, that is, the burning of the hotel. Appellant will have full opportunity to present this contention whenever the State attempts to secure more than one conviction, and if he be correct (we are not holding that he is), he may then successfully raise that point.

■ Appellant's principal contention on this appeal is, that the record does not contain sufficient evidence to sustain a finding that the fire was of incendiary origin. A full statement of the facts concerning the burning of the hotel may be found in the previous cases of State v. Pierson, 331 Mo. 636, 56 S. W. (2d) 120; State v. Pierson, 337 Mo. 475, 85 S. W. (2d) 48; State v. Meadows, 330 Mo. 1020, 51 S. W. (2d) 1033. The evidence in this case was not materially different. We will omit entirely a discussion of the financial condition of the hotel, which the State claimed was a motive for the crime, because the evidence in this case and the evidence on the same point in the former cases are identical. We will, however, state the evidence tending to establish the fact that the fire was the result of a conspiracy to commit arson. The Buckingham Hotel Annex, the object of the arson, was located at 4954 West Pine Boulevard, St. Louis, Missouri. The Buckingham Hotel proper was located on the opposite side of the street. There was a passage-way between the two buildings under Pine Street. Robert H. Cotham was the night clerk at the Buckingham Hotel, and Andrew B. Meadows was night watchman at the Annex. Ralph Pierson, appellant in this case, was part owner of the hotel property, in charge of its financial affairs, and also supervised the management of the hotels.

Robert H. Cotham testified for the State. Appellant challenged the competency of this witness, contending that he was mentally deficient. We will discuss this question later. An examination discloses that this witness's testimony was substantially the same at this trial as at previous trials. His version of the episode in narrative form, as found in the record, was about as follows: Appellant approached Cotham about burning the hotel because the insurance money was needed. He advised Cotham to see Meadows about setting the fire. Cotham saw Meadows and, after some negotiations, Meadows agreed to burn the Annex for ten per cent of the damage done by the fire. Pierson gave Cotham money from time to time to pay Meadows. Meadows was paid $100 when he agreed to commit the arson. On the morning of December 5, 1927, at about three A. M., Meadows went from the Annex to the hotel proper where Cotham was at work and stated to him, "She's off." A minute or so later a guest in room number 237 in the Annex telephoned and stated that smoke was coming into his room. Cotham immediately conveyed that information to Greathouse, the night clerk at the Annex. The fire made such rapid headway that seven people perished therein. After the fire, as per Cotham's testimony, Meadows hounded him for money. Cotham in turn would see Pierson, the appellant. Pierson gave Cotham money at various times, a total of about $800, which was to be and was paid to Meadows. On one occasion Cotham and Meadows met Pierson near the Westgate Hotel and Pierson handed Cotham a package which was turned over to Meadows. This package contained money. Pierson stated at the time that that was all he had, but that he would get more later. Cotham maintained at this trial, as he had at previous trials, that he only acted as a communicator between Pierson and Meadows. Meadows was convicted of murder in the first degree and received the death penalty. [See State v. Meadows, supra.] His sentence was commuted to life imprisonment.

Meadows testified in this case, and we note some variance in his testimony here and that given at previous trials. In many respects his testimony coincided with that of Cotham. He testified that Cotham approached him about the burning of the Annex, stating that appellant had requested him to do so; that Cotham offered him $10,000 to commit the arson. Meadows stated that he accepted $100 from Cotham when these negotiations were in progress. He testified that on the night of the fire he went to the Buckingham Hotel and passed by Cotham's desk at about three A. M.; that Cotham stated to him in substance, "Well, its all over;" that sometime after the fire he and Cotham met Pierson near the Hotel Westgate, and Pierson gave Cotham a package containing money which was turned over to the

witness; that Pierson stated at the time that that was all he had, but would get more. Thus far the testimony of Meadows and Cotham harmonizes, but Meadows denied that he agreed to burn the hotel and emphatically denied that he set the fire. He testified that he told Cotham there were guests in the hotel who were friends of his and he did not want to burn them or their property. He testified that he accepted the $100 and demanded more money after the fire, because he had agreed to keep his mouth shut about the plan to burn the hotel. Meadows further testified that shortly before his arrest he met Pierson on a downtown street and had an argument with him. Note Meadow's evidence:

"Q. Tell the court and jury about that meeting? A. Well, I was coming along on the pavement and he was facing me. I didn't see him until he got right up to me. I spoke to him.

"Q. Will you take your hand down and talk a little louder? A. I spoke to him and asked him, 'What do you people aim to do with me?' He said, 'Nothing. Why?' 'Well,' I said, 'I should go ahead and take you down and turn you in.' He said, 'I wouldn't go with you.'

"Q. You said, 'I should take you down and turn you in,' to Ralph Pierson? A. Yes.

"Q. He said he wouldn't go with you? A. I said 'You people.'

"Q. You said what? A. I said 'You people.' I didn't just mention him.

"Q. Well, he was the only one there? A. Yes.

"Q. All right. What else did he say or what did you say? You said he said he wouldn't go with you? A. I said I could have him carried down there, and I just stepped to the pavement, just whistled and he said not to do that.

"Q. I didn't understand that. A. He said not to do that.

"Q. He said not to do that? A. Yes, and he gave me a dollar then and said that's all he had, and he would see me the next evening about five o'clock I think it was, three or five, and he would bring me some money and would look for me a job somewhere, and the next time I saw him was in the hospital over there after I was picked up.

"Q. He said he would meet you the next day and bring you some money? A. Yes, sir.

"Q. Did he meet you? A. No."

Appellant testified in his own behalf, but he was only asked a few questions. He denied having had anything to do with the alleged conspiracy to burn the hotel and also denied that he paid Cotham or Meadows any money. That is the substance of his testimony.

The evidence of Meadows and Cotham, if true, was sufficient to establish a conspiracy to burn the hotel, and to show that appellant was the prime instigator of this nefarious scheme. Appellant contends that, since Meadows and Cotham both denied that they set fire to the building, the record is free from any evidence to sustain a finding that the hotel fire was the result of any criminal act or conspiracy. To this we cannot agree. The conduct of these three alleged conspirators, subsequent to the fire, as per the evidence in the case, bears all the ear-marks of guilt. Why was Meadows demanding money? Why was Cotham collecting money from Pierson to pay Meadows? And why was Pierson paying the money? The only logical and legitimate inference to be drawn is, that all three knew that the fire was the product of their conspiracy. Meadows, who, according to his own evidence, would have the jury believe that he was too honest and honorable to set fire to the hotel, admitted that he discussed the question with Cotham and was willing to keep his mouth shut and let the hotel and his friends burn for a few dollars. After his friends and their property did burn, he admitted that he continued to hound Pierson and Cotham for money and even threatened to have Pierson arrested if he did not pay him more. The evidence of Meadows, during the cross-examination by the attorney for appellant, while denying guilt, points to anything but innocence. The fire evidently began in room number 137. Meadows testified that he knew no one was in that room. It was the maid's room and never used at night. His evidence, that he went to see Cotham at about three A. M., and Cotham stated to him that everything was over or would be, coincides to some extent with Cotham's evidence. The evidence of Cotham, as related above, that Meadows stated at that time, "She's off" (and we may add she was off, because the fire broke out almost immediately thereafter), is consistent only with guilt. The fire had been set. One conspirator had communicated to another the fact that the fire had been started. Note a small portion of Meadows' evidence, which to us does not indicate innocence:

"Q. Did you tell Cotham if he attempted to set that place on fire and burn it and burn up your friends, that you were going to tell about it? A. I told him—no, I didn't tell him that. I told him —no, I didn't tell him that. I said, 'If a man came in there and I didn't know him, naturally I would have to find out what he was doing.

"Q. You said you would keep your mouth shut for $100.00? A. No, not for the $100.00. I was to get $5,000 to keep my mouth shut."

The facts and circumstances surrounding the fire; the accusation of one conspirator against another; their conduct, particularly after

the fire; all point to but one reasonable inference, that is, the hotel was set on fire by Meadows in pursuance of the conspiracy, and all of the conspirators knew this. That the fire was of incendiary origin may be proven by circumstantial evidence as well as by direct evidence. In the Meadows case the contention was made that absent the confession of Meadows the evidence was insufficient to prove the *corpus delicti*. In State v. Meadows, 330 Mo. 1020, 51 S. W. (2d) 1033, 1. c. 1036, we said:

"With that confession in addition to the other evidence, the case against defendant is complete. Even without it we think there was ample evidence to sustain a finding that the fire was of incendiary origin, set pursuant to the conspiracy admitted by defendant on the witness stand."

See also State v. Berkowitz, 325 Mo. 519, 29 S. W. (2d) 150, 1. c. 152 (1-3), where this court said:

"In an arson case it is not sufficient to establish the *corpus delicti* to show that a fire occurred. There must be proof of circumstances from which the jury will be authorized to find the further fact that such fire was of incendiary origin. [5 C. J. 570 to 575, secs. 51 to 56; 2 R. C. L. 513, sec. 17.] In addition to proof of the *corpus delicti*, there must be proof tending to show that the accused was the incendiary. [2 R. C. L. 513, sec. 17.] Both the incendiary origin of the fire and the guilty agency of the accused may be established by circumstantial evidence. [State v. Ruckman, 253 Mo. 487, 161 S. W. 705; State v. Morney, 196 Mo. 43, 93 S. W. 1117; State v. Myer, 259 Mo. 306, 168 S. W. 717; State v. Sheline (Mo.), 225 S. W. 673; State v. Jackson (Mo.), 267 S. W. 855.]

"The facts in the above cases are different from those in the case at bar, but said cases are authority for the proposition that both the *corpus delicti* and defendant's criminal agency may be established by circumstantial evidence. In the case at bar the proof of both of those essential facts rests entirely upon circumstantial evidence. Indeed, both of these important elements are established by the same facts in this case."

■ Appellant argues that a conspiracy was not established by competent evidence. Appellant states in his brief:

"Had the alleged conspiracy been proven, Meadows would have been competent as to matters *after it had been proven,* but, in the case at bar, no conspiracy had been proven, yet Meadows was allowed to testify, presumably to prove the alleged conspiracy, which he was incompetent to do, as declared in the Thomas case, just quoted; but, on the other hand, he proceeded to prove that he refused to enter into the alleged plot."

We cannot agree with appellant. A conspiracy may be proven by the evidence of co-conspirators. The rule is stated in 12 Corpus Juris, 636, section 228:

"A co-conspirator is an accomplice and although uncorroborated is always a competent witness. The fact that he is an accomplice operates, not against the admissibility of his testimony, but only against its credibility."

Meadows, by his own evidence, admitted he was a co-conspirator. He testified that for the sum of $5,000 he agreed to keep his mouth shut and not interfere with Cotham and Pierson in the burning of the hotel. Meadows' evidence, that Pierson paid him money and promised more, was direct evidence of Pierson's connection with the conspiracy. Cotham testified that Pierson was the originator of the plan. That evidence was competent to prove appellant had a part in the conspiracy. [State v. Pierson, 337 Mo. 475, 85 S. W. (2d) 48, l. c. 56 (11); State v. Stogsdill, 324 Mo. 105, 23 S. W. (2d) 22, l. c. 28 (13); Richards v. State, 43 Ohio App. 212, 183 N. E. 36.] Conspirators are accomplices in crime, and it is well settled law that a person may be convicted on the uncorroborated evidence of an accomplice. [State v. Watson, 31 Mo. 361; State v. Stogsdill, 324 Mo. 105, 23 S. W. (2d) 22; State v. Shepard, 334 Mo. 423, 67 S. W. (2d) 91, l. c. 95 (14, 15); People v. Collier, 295 Pac. 898.]

Appellant assailed the competency of witness Cotham on the ground that the witness was mentally deficient. Before this witness testified the State offered to read to the jury his evidence given at a former trial, but no agreement was reached. The State, therefore, brought this witness to court. He was very weak and was carried to the courtroom on a stretcher. Appellant offered substantial evidence that the witness was mentally unfit to give testimony; also that the witness was too sick to be subjected to a cross-examination. It is evident that the witness was a very sick man. He was suffering with a heart ailment which required frequent rests during the examination. The State offered substantial evidence that the witness, although weak because of his illness, was mentally sound and rational and able to give testimony if he were given time. The evidence, as given by the witness, does not disclose any trace of insanity, so far as the writer of this opinion can discern. The trial court was of the same opinion. The witness's evidence, at this trial, was substantially the same as at previous trials. He was unable to remember some of the dates, and frankly admitted that he could not do so because of his illness and because he had undergone many hardships since the occurrence in December, 1927. He had been serving his sentence in the penitentiary and was brought from there to testify in this case. The record discloses that Cotham well knew what was

transpiring at the trial. During the cross-examination he often stated that the attorney was asking questions which he had previously asked and had been answered. The record shows that the witness was correct in his assertions. He complained because he was being subjected to a lengthy cross-examination, stating he was too ill, and that due to his heart affliction he would get out of breath. The cross-examination was interrupted a number of times to permit the witness to rest, but the record discloses that the cross-examination was not unduly limited. The trial court gave an instruction advising the jury that if any witness was suffering from a defect of reason, derangement, or loss of mind, then they would be authorized to consider that fact in determining the credibility of such witness. We do not find wherein appellant's rights were prejudiced in this case. If the witness was hopelessly insane and too weak to testify the State had the right to read the witness's evidence given at the former trial. Appellant evidently did not want this done. He knew the witness's condition and was prepared to and did introduce an abundance of evidence touching the witness's mental and physical condition, this, of course, in the hope that the jury would disregard his evidence. The jury found against appellant on this point and we are not authorized to interfere.

Appellant complained of the trial court's refusal of a number of instructions offered by the defendant. We will discuss these only in a general way. The instructions given by the court included a cautionary instruction with reference to the evidence of accomplices; an instruction advising the jury that if the evidence failed to show a motive to commit the crime charged they ought to consider such fact in making up their verdict, and that the absence of motive was a circumstance in favor of innocence. An instruction on circumstantial evidence was given, also the usual instructions on reasonable doubt, the good character of the defendant and the credibility of witnesses. A lengthy converse instruction, asked by appellant, was also given, which informed the jury that they should acquit appellant unless they found all of the facts enumerated in the instruction, which were the essential elements necessary to sustain a conviction. An instruction was also given, at defendant's request, advising the jury that where a building burned the presumption was that the fire was the result of accidental and natural causes and not the result of the willful act of some person. A number of instructions, which were refused, were repetitions of matters covered in defendant's converse and other instructions and therefore were not necessary. We do not find any prejudicial error in the giving or refusing of instructions.

Appellant objected to certain portions of the argument to the jury by the State's attorney. One contention concerned the comment of the State's attorney on the failure of appellant, while upon the witness stand, to testify or explain with reference to some incriminating circumstances and evidence. The trial court overruled appellants objection. It is well settled law that when a defendant does not take the witness stand, that fact should not be referred to in the argument by the State's attorney. But it is also well settled, that when a defendant does take the witness stand the prosecuting attorney may comment on the fact that the defendant failed to explain incriminating evidence against him. In State v. Hancock, 340 Mo. 918, 104 S. W. (2d) 241, 1. c. 246, (10), we find the following directly in point:

"The defendant took the stand, but his testimony was limited. In the argument of the State's attorney comment was made upon defendant's failure to explain certain facts. There was no error in overruling defendant's objections to such comment. [State v. Larkin, 250 Mo. 218, 234(3), 157 S. W. 600, 604(4), 46 L. R. A. (N. S.) 13; State v. Emry (Mo.), 18 S. W. (2d) 10, 11, 13(7); State v. Drew (Mo.), 213 S. W. 106, 107(5).]"

From the record we learn that at another point in the argument the State's attorney said, in commenting on the evidence of Meadows, a witness for the State:

"The motive—the reason is that this defendant desired to recoup the loss he expected he was going to undergo. Cotham told the truth, and Meadows, I don't think you are going to damn him—I don't think you will condemn him, and I don't think you will put a halo around this defendant's head, for the reason that Meadows does not come into court again and admit to you twelve gentlemen that he actually set fire to that hotel.

"Mr. LACY: No, I object to that. That's a terrible thing for him to say, and I ask that the jury be discharged and a mistrial ordered, and counsel be reprimanded.

"Mr. SULLIVAN: I didn't understand the ground.

"Mr. LACY: Saying something that is not true in this case; uttering something that is absolutely false.

"The COURT: Overruled.

"Mr. LACY: About Mr. Meadows coming into this court and admitting that he set fire to the Buckingham. There is no such evidence in this case and never has been.

"The COURT: There is no such evidence.

"Mr. LACY: I want the court to instruct the jury that there is no such evidence.

"The COURT: Gentlemen of the jury, you are instructed that there is no such evidence.

"Mr. SULLIVAN: May we ask, in view of the gentleman's charge, that we did not say there was such evidence. The record will show we said the jury would not expect him to come into this Court and say he set the match to the Buckingham Hotel Annex.

"Mr. LACY: As he did before.

"Mr. SULLIVAN: I didn't say that.

"Mr. LACY: Yes, you did.

"Mr. SULLIVAN: Then it was a mistake, I didn't think I did, and I withdraw it if I did.

"The COURT: You are instructed, gentlemen, to disregard it. It should have no part in your deliberations."

The record fails to show any exceptions to the failure of the court to grant appellant's request to declare a mistrial. We take it for granted that counsel was satisfied, at the time, with the ruling of the trial court.

The trial in this case occurred nine years after the alleged commission of the crime, six years after appellant was indicted. Certainly a sufficient time had elapsed, especially in a city as large as St. Louis, so that a jury would deliberate calmly upon the question of appellant's guilt or innocence. We have painstakingly read the record and have reached the conclusion that appellant had a fair trial. He obtained two reversals by this court and this third trial we find without prejudicial error. We have also reached the conclusion that the evidence was sufficient to sustain the verdict of the jury. The record proper does not disclose any material defect. The indictment in this case was substantially the same as in the case of State v. Meadows, supra. The sufficiency of the indictment was questioned in that case and this court found it good in both form and substance.

The judgment is affirmed. *Cooley* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.