The State v. Ralph Pierson, Appellant.—85 S. W. (2d) 48.

Division Two, July 11, 1935.

*Verne R. C. Lacy* for appellant.

478

*Roy McKittrick*, Attorney General, and *Wm. W. Barnes*, Assistant Attorney General, for respondent.

COOLEY, C.—Defendant and three others, Lewis E. Balson, Andrew B. Meadows and Robert H. Cotham, were jointly indicted for murder in the first degree for the killing of May Frazer, alleged to have been done in the perpetration of arson, to-wit, the burning of the Buckingham Hotel Annex in St. Louis on December 5, 1927. Severances were granted and each defendant's case was disposed of separately from the others. Cotham pleaded guilty to murder in the second degree and was sentenced to ten years' imprisonment in the penitentiary. Meadows was tried and convicted of murder in the first degree, sentenced to death and the judgment was affirmed by this court, State v. Meadows, 330 Mo. 1020, 51 S. W. (2d) 1033. Meadows' death sentence was eventually commuted to life imprisonment. This defendant was tried and convicted and on appeal to this court the judgment was reversed and the cause remanded for new trial, State v. Pierson, 331 Mo. 636, 56 S. W. (2d) 120. On a second trial he was again convicted and was sentenced to life imprisonment. This appeal was taken by defendant from the judgment on said second trial.

The Buckingham Hotel Annex consisted of two four-story buildings, called respectively the east and west wings, located on the south side of West Pine Boulevard, connected by "bridges" or passageways at each story. Opposite thereto, on the north side of the street, was the main hotel building, called the Buckingham Hotel. It was connected with the Annex by an underground tunnel or subway. The east wing of the Annex burned. That building was old and inflammable. The fire occurred at about three o'clock in the morning of December 5, 1927. At the time of the fire Meadows was night watchman at said east wing and Cotham was night clerk at the hotel proper. Both had occupied those respective positions for

a considerable time. Said east wing housed a large number of guests, many of whom resided there. Among the latter was May Frazer, who, the State's evidence tends to show, lost her life in the fire.

The State's evidence tends to prove that said hotel properties were owned by the Buckingham Realty Company, a corporation whose stock, except one share, was owned by defendant and Balson, and that the properties were insured and were heavily encumbered with mortgages or deeds of trust which were about to be foreclosed. The corporation was in financial straits, owing a good deal of money besides that secured by liens on its buildings. It had been adjudged bankrupt and its properties were being operated by a receiver. The State's theory is that defendant entered into a conspiracy with Cotham and, through Cotham, with Meadows, to have the Annex burned for the purpose of collecting the insurance and that said east wing was set fire to and burned pursuant to such conspiracy. It is not contended that defendant himself set the fire. If he is guilty it is because of the conspiracy and the acts done pursuant thereto by his coconspirators. The conspiracy was shown by the testimony of Cotham and Meadows, who were called as witnesses by the State. The facts developed by the evidence are in most respects substantially the same as on the former trial of this case and in State v. Meadows, supra. For detailed statement thereof reference is made to said cases of State v. Meadows, and State v. Pierson, supra. Such further reference to the facts as may be deemed necessary for the disposition of this appeal will be made in the course of the opinion.

I. Before the trial defendant, by leave of court, withdrew his plea of not guilty for the purpose of filing a motion to quash the indictment and filed such motion, the plea of not guilty being afterwards re-entered. The ground of the motion was that the grand jury had returned the indictment without having heard "any evidence touching the guilt or innocence of the said Ralph Pierson." The court permitted defendant to offer evidence in support of his motion. At the hearing it developed that defendant was not contending that the grand jury had not heard any evidence at all, a large number of witnesses having been sworn and examined, but that there had been no *legal* evidence tending to show that the fire had been of incendiary origin and no *legal* evidence connecting defendant with the alleged crime. In the course of the hearing it was admitted by the State that Cotham and Meadows did not personally appear before the grand jury and it was shown that sworn statements previously made by them were presented to that body.

Defendant sought to prove by the foreman of the grand jury that had returned the indictment that no witness had testified "to any facts concerning an incendiary origin of the fire" and that

"the only evidence that the fire was of incendiary origin was the written statements" of Cotham and Meadows, who did not personally appear before the grand. jury. The court sustained the State's objection and refused to permit the grand juror to relate what testimony had or had not been heard by the grand jury.

Defendant called the circuit attorney and assistant circuit attorney, each of whom had attended the grand jury sessions at times during its investigation. of the alleged offense, and by each attempted to prove in substance and effect the same thing he had offered to prove by the grand juror. The court refused to permit the witnesses to state what evidence had or had not been given. It did permit them to say whether or not the grand jury had heard any evidence, but declined to go into the question of the sufficiency thereof to justify an indictment.

In State v. Grady, 84 Mo. 220, this court, speaking of a motion to quash the indictment on the ground that it had been returned without the grand jury having heard any evidence, said, 84 Mo. l. c. 223: "In such an inquiry the question is not as to the sufficiency of the evidence before the grand jurors, for of that they are the judges, but it is whether they had before them any evidence at all. If it were otherwise, it would result that the court would become the tribunal to indict as well as the tribunal to try the case." The wisdom and practical necessity for that rule is well illustrated in the instant case. More than a score of witnesses testified before the grand jury. In order to determine whether or not there was "any legal evidence" before that body tending to prove that the fire was of incendiary origin or to connect the defendant therewith the court would have had to hear and consider all the evidence that had been presented to the grand jury. If such rule were established it is not difficult to see to what intolerable lengths it might be carried. That some incompetent evidence may have been heard by the grand jury is no ground for quashing the indictment. [State v. Shreve, 137 Mo. 1, 5, 38 S. W. 548.] That an indictment will not be quashed because the grand jury has heard some incompetent evidence. [See. also, State v. Coates, 130 N. C. 701, 41 S. E. 706, and People. v. Sexton, 42 Misc. 312, 86 N. Y. Supp. 517, both cited by appellant.]

In the Coates case the court sums up its discussion and review of authorities thus: "The uniform practice, as established by the authorities, is that the court will not inquire into the proceedings had before the grand jury, and will only quash when all the witnesses were incompetent."

People v. Sexton, supra, is, we think, authority against appellant's contention.

State v. Grady, supra, has been cited and followed by this court in later cases, the most recent of which is State v. Shawley, 334 Mo.

352, 67 S. W. (2d) 74, which case also holds, following former decisions, that "an indictment cannot be impeached in this manner by the members of the grand jury who returned it." In the Shawley case, as in the instant case, it was contended that the grand jury that returned the indictment had done so without having heard any evidence, also that it had not had before it sufficient evidence. The facts proved tended at least as strongly as in the instant case to support the appellant's contentions but said contentions were disallowed because it appeared that the grand jury had heard some evidence and the court declined to go into the question of the sufficiency thereof. We hold that the motion to quash in the instant case was properly overruled.

II. Appellant contends that the court erred in permitting the State to offer evidence tending to prove motive on his part to burn the building before proof of the *corpus delicti* had been made, citing in support of such contention State v. Francis, 330 Mo. 1205, 52 S. W. (2d) 552. In that case certain admissions and an extrajudicial confession of the defendant had been introduced in evidence and on appeal a complaint was made concerning the order of proof. This court said, 330 Mo. l. c. 1211, 52 S. W. (2d) l. c. 555 (3):

"The admissions and voluntary extrajudicial confession of the appellant were competent evidence against her, and there is no rule fixing a particular place in the order of proof for the introduction of such evidence unless it be that the *corpus delicti* must be first proven, as was clearly done in this case. [State v. Bowman, 294 Mo. 245, 258, 243 S. W. 110, 114.]"

The opinion does not further discuss the question of order of proof. The Bowman case, cited in State v. Francis, does not deal with or discuss that question. It holds that under the evidence in that case (a murder case) the *corpus delicti* was not sufficiently proven and that a conviction based upon the extrajudicial admission or confession of the defendant, uncorroborated by other circumstances, could not be sustained. Evidently the court, in the Francis case, cited the Bowman case with reference to the statement that the *corpus delicti* had been clearly proven rather than in relation to the suggestion concerning the order of proof. As a general rule the order of proof is a matter resting largely in the discretion of the trial court. [State v. Stogsdill, 324 Mo. 105, 129, 23 S. W. (2d) 22, 31; State v. Barnes, 325 Mo. 545, 29 S. W. (2d) 156, 158 (8).] In the Francis case the court intimated that in the matter of extrajudicial confessions and admissions of a defendant there *may* be an exception to the rule, though the court did not definitely so hold. Determination of the precise point in question was not necessary to the decision of the Francis case. Nor need we determine in this case

whether or not the situation presented in the Francis case constitutes an exception to the general rule, or, if so, the reasons therefor. That observation was made with reference to extrajudicial confessions or admissions and without statement of the reasons for the exception or citation of authorities giving such reasons. In the instant case the evidence alleged to have been introduced out of its proper order related to a different subject, viz., motive. Without attempting to point out the distinction, if any, we deem it sufficient to say that, after careful examination of the record, we are convinced that there was no prejudicial error in the court's ruling in this matter. As stated by the learned trial court in ruling upon this question, if sufficient evidence to prove the *corpus delicti* had not been introduced it would have become the court's duty in any event to direct a verdict for the defendant. Such evidence was produced. In matters of this kind we think it best that trial courts should not be hampered with hard and fast rules, but should be left free to determine such matters in their judicial discretion, subject, of course, to review on appeal if it appears that the discretion has been abused to the prejudice of the complaining party. We perceive no such abuse of discretion or prejudice in this case.

III. Over the objections of defendant the State was allowed to read to the jury the testimony of Mrs. Blanche Kaune, given on the first trial of the case. At said first trial Mrs. Kaune had testified as a witness for the State and her testimony had been preserved in a bill of exceptions duly allowed, signed and filed and thus made part of the record of that trial. She had testified to facts bearing upon and tending to show motive on the part of defendant to commit the arson in question. She was a real estate agent and as such had represented the owners of the hotel properties in the negotiations and transactions through which Balson and Pierson had acquired the properties for their corporation. She testified on the first trial relative to those transactions, the price paid, how the money was procured, etc., and to numerous conversations and negotiations with defendant, especially after the Buckingham Realty Company had become financially embarrassed, looking to a sale of the property, to defendant's representations as to its value and his efforts to dispose of it. It is needless to detail her testimony. Its materiality in the second trial is not disputed by the State. In fact it was stressed and greatly relied upon by the State as tending strongly to prove motive. The first trial had been held in January, 1931, and Mrs. Kaune had testified on January 21, 1931. Within a month thereafter she had been placed in an institution on account of mental derangement, and, as we understand the record, she had thereafter been constantly in one or another institution because of such trouble. At the time of the second trial, in the latter part

of April, 1933, she was an inmate of the State Insane Asylum at Farmington, having been committed thereto in March, 1933, after having been adjudged insane. She was not brought to the court-room. In order to lay foundation for the introduction of her former testimony the State called Dr. Hoctor, who was a physician and superintendent of the Farmington asylum. He was sworn and examined before the court in the absence of the jury. He testified at considerable length, giving a full description of the patient's mental and physical condition, her conduct, the symptoms she manifested, etc., and also the history of her mental trouble as same had been furnished to the asylum upon her admission. From his testimony it appeared that Mrs. Kaune was suffering from dementia praecox, a progressive disease; that from the history, the disease appeared to have had its inception as early as 1931, and that said history further indicated the following: that about 1925 she had received an injury to her head, following which there seemed to be a change in her disposition; that she had married in 1926 and shortly thereafter her husband had become an invalid and she had nursed him for about three years, until he was committed to an insane asylum where he later died. Dr. Hoctor testified that worry over her invalid husband and his maintenance in 1927 and 1928 might have been a predisposing cause of her own mental trouble and that, from information derived from her family, it appeared that the first indications of her mental unsoundness were noticed in January, 1931, when she worried about being summoned as a witness for the first trial. He said that at the time he was testifying the patient was subject to hallucinations, the seeing of imaginary people and a misconception of ideas and facts; that he did not believe she could at that time give testimony that could be relied upon; that he was unable to give an opinion as to whether or not she could have given "reliable" testimony at the time of the first trial,—it might possibly be unreliable on account of her then condition; that she sometimes has lucid intervals, of varying length, but he could not tell in advance when such times would come; that at the time he was testifying she was physically well enough to be brought into court but was actively disturbed mentally, in a highly emotional state and in no condition to be among people. He could not say that she was not suffering from dementia praecox at the time she testified on the first trial. The foregoing outline of Dr. Hoctor's testimony will suffice for the disposition of the legal questions presented on this branch of the case.

When the State had concluded its evidence before the court tending to show that Mrs. Kaune was then insane and incompetent to testify the defendant asked leave to offer evidence, particularly the testimony of an alienist, Dr. Bradley, for the purpose of showing

that Mrs. Kaune had been suffering from the same disease and incompetent to testify when she had given her testimony on the first trial, the defendant claiming that he had not known of such mental condition of the witness when she testified at the first trial and therefore could not at that time object on such ground. The court sustained the State's objection to such offer of proof, holding that the question of the witness's competency at the first trial had been then adjudicated and could not be gone into at the present trial The court also indicated that it would not entertain objections to specific portions of Mrs. Kaune's testimony as contained in the bill of exceptions, which defendant contended were incompetent for reasons other than her alleged insanity, but that the State might read it all as preserved in the bill. The jury was then recalled and the testimony was read. None of the evidence which the court had heard relative to Mrs. Kaune's mental condition was introduced before the jury, they being informed only that Mrs. Kaune could not be present and, therefore, the State would be permitted to read her testimony given on the first trial. On the record thus outlined several legal questions arise. We shall consider such as seem to require notice.

(a) Appellant contends that the introduction from the bill of exceptions of Mrs. Kaune's testimony violated his constitutional right to be confronted with the witnesses against him. This contention we must deny. From an early day (see State v. McO'Blenis, 24 Mo. 402), we have held that the constitutional right of confrontation is not denied where a witness is dead at the time of trial and the testimony of such witness, given and duly preserved at a former hearing in the same case, at which the defendant was present and was accorded the right to cross-examine, is read to the jury. In State v. Harp, 320 Mo. 1, 6 S. W. (2d) 562, this court en banc extended the rule to include the testimony of a witness given at a former trial of the same case and preserved in a bill of exceptions, the witness not being shown to be dead but being beyond the jurisdiction of the court and his presence unprocurable when his previous testimony was offered. That case reviews the authorities. We again reviewed authorities on this question in State v. Bradford, 324 Mo. 695, 24 S. W. (2d) 993. No useful purpose could be subserved by citing and reviewing them again. We have not had before us a case wherein the witness whose prior testimony was offered had become incompetent by reason of insanity, but on principle, if such testimony is competent in the circumstances shown in the Harp case it should be competent where the witness has become wholly incompetent to testify by reason of insanity. In such situation the witness's presence at the trial is to all intents and purposes as unattainable as if he were dead, as was said of the absent witness in

the Harp case. Defendant in this case was confronted with the witness on the former trial and accorded opportunity to cross-examine her. Such confrontation was held in the Harp case to satisfy the requirements of the Bill of Rights in this respect.

(b) Appellant further contends that there was no sufficient foundation laid for the introduction of this evidence because Mrs. Kaune was not produced for *voir dire* examination before the court; that the hearing by the court of extrinsic evidence without *voir dire* examination of the alleged insane person is not, alone, sufficient. He cites State v. Herring, 268 Mo. 514, l. c. 535, 188 S. W. 169, and, 28 R. C. L. 453, sec. 40. In the Herring case the question of competency of an insane person under our statute, Section 1731, Revised Statutes 1929 (Mo. Stat. Ann., p. 4011), was considered and the following (among other) rules were deduced:

". . . (b) that lawful confinement in an asylum for the insane, or an adjudication as an insane person, creates a prima-facie presumption of absolute incompetency as a witness; but (c) such presumption is rebuttable by the *voir dire* examination of the witness alone, or when aided by extrinsic evidence."

In 28 Ruling Case Law 453, section 40, supra, it is said that the witness's competency "may be ascertained by an examination of witnesses acquainted with him, or by a personal examination of him by the court or by counsel in the presence and under the direction of the court, or by all the foregoing modes, at the discretion of the court." We think the better practice, as intimated in the Herring case, would be to have the witness produced and examined before the court, at least if it is possible for that to be done without unreasonable risk. We are inclined to think that could have been done in the instant case. However, we would not feel disposed to reverse on this ground because the court offered to issue a writ for the production of Mrs. Kaune if defendant's counsel would prepare and present written application therefor, which they did not do. They perhaps refrained from so doing because the court orally requested Dr. Hoctor, superintendent of the asylum, to produce the witness if she could safely be brought. He did not bring her, giving as his reason that she was in a very excitable mental state and in no condition to be among people, and there the matter of her production in court was dropped. Since we have concluded that this judgment must be reversed for another reason we need not further discuss this question as it may not again arise. What we have said on this point is for the guidance of the court in the event of another trial.

(c) In presenting his case defendant called Dr. Bradley as an expert witness; and after showing his qualifications and that he had read a transcript of Dr. Hoctor's testimony given before the court in relation to Mrs. Kaune's mental condition, including her history

as testified to by Dr. Hoctor, offered to prove by him that in his opinion Mrs. Kaune was suffering from dementia praecox when she gave her testimony on January 21, 1931, and was then unable to distinguish between right and wrong or to appreciate the obligation of an oath; that dementia praecox is a slow and progressive disease, not a mental disturbance coming on suddenly, and, in effect, that Mrs. Kaune, by reason of a diseased mind, was not capable of giving trustworthy testimony at the time she testified at the first trial. We are stating the effect of the offer in our own language. It covers about two typewritten pages of the transcript. It contained an offer to prove by other witnesses facts tending to show that Mrs. Kaune was not of sound mind when she gave her testimony,—this, no doubt, because there had been much previous discussion between court and counsel regarding the admissibility of evidence designed either to show that Mrs. Kaune had been incompetent to testify because of insanity at the time of the first trial or to affect her credibility and the weight of her testimony on account of such condition. The State objected to all such evidence on the theory that it was inadmissible for any purpose; that the question of the witness's competency was settled when she was permitted to testify at the first trial, and that her testimony could not be impeached in the manner attempted because no foundation had been laid therefor by cross-examination when she had been on the stand. Defendant contended that he had not then known of Mrs. Kaune's diseased mental condition and could not, therefore, lay a foundation for impeaching evidence of the kind in question by cross-examination. The court sustained the State's objections, refusing to admit any evidence of the kind indicated. From the whole record it is clear that the State's objections and the court's rulings were not because of any informality or insufficiency of defendant's offers of proof but because the court considered the evidence inadmissible.

We think the court erred in excluding that evidence and that the error was prejudicial. Regardless of the question of the *competency* of the witness to testify at the time she gave her testimony, the fact, if a fact, that she was then suffering from a disease, progressive in character, which had then begun to undermine her mentality and render her incapable or less capable of giving a trustworthy account of matters about which she testified, as defendant proposed to prove, would have a bearing on the question of the weight to be given to her testimony,—a question which the jury had the right and the duty to determine. It will be recalled that according to the State's evidence introduced before the court, dementia praecox, the disease from which Mrs. Kaune suffered, is a progressive disease and one in which the afflicted person is subject to hallucinations and has a misconception of ideas and facts. In less

than a month after she had testified, her irrationality had become sufficiently noticeable that she was placed in an institution for treatment and had grown progressively worse so that at this trial she was incompetent to be sworn as a witness. Dr. Hoctor could not say that she did not have dementia praecox at the time of the first trial nor that her testimony given at that time might not have been rendered less reliable by reason of the disease. None of the facts relative to her mental condition were given to the jury. They did not have the benefit of seeing and hearing her on the witness stand. They had only her former testimony read from the record.

A witness may be impeached for moral delinquency because it affects his credibility and the weight and probative value of his testimony. That is the purpose of impeaching evidence. To illustrate, suppose the testimony of a witness, not present at the trial, is read, and that prior to the giving of such testimony such person had been convicted of an infamous crime or that at the time he testified his reputation was notoriously bad. Will it be doubted that such facts could properly be shown when his testimony is introduced? If, in a similar situation, the witness, instead of being morally delinquent was so impaired mentally by reason of disease at the time he testified that he could not give a trustworthy account of matters about which he undertook to speak it seems clear to us that the same reason exists for allowing proof of the fact to the end that the jury may be able justly and intelligently to weigh his testimony and determine its value. It is a species of impeachment: not, perhaps, strictly speaking, impeachment of the witness but rather impeachment of the witness's testimony. Nor do we think it necessary for the introduction of such impeaching evidence that a foundation therefor should have first been laid by questions propounded to the witness on cross-examination. It is not impeachment by proof of contradictory statements. In the very nature of the case such foundation could hardly be required or practicably laid for impeaching evidence such as we are considering. Speaking to this point the Supreme Court of Iowa, in Alleman v. Stepp, 52 Iowa, 626, 628, 3 N. W. 636, said:

"Can it be doubted that the credibility of a witness may be assailed by showing his want of mental capacity? It is said that the infirmity of memory should be shown by cross-examination. But it might not be made to appear in that way, though it really existed."

The court further said:

"Under familiar rules of the law the credibility of a witness may be impeached by showing moral defects. Mental defects in the witness, or loss or impairment of memory, will, according to the observation of all men, detract from the credibility otherwise due a wit-

ness, just as surely as do moral defects. It is not reasonable to hold that the law will permit impeachment of a witness by showing the moral defects of his character, and will not permit impeachment by proof of defects of memory caused by diseases of the body or mind.''

That such kind of impeachment is competent we think is indicated by the reasoning in: Holcomb v. Holcomb, 28 Conn. 177; District of Columbia v. Armes, 107 U. S. 519.; Reg. v. Hallett, 5 Cox's Cr. Cas. 259. We hold that the impeaching evidence should have been admitted and that its exclusion constituted reversible error. For the guidance of the trial court in the event of another trial we add that defendant should be allowed to object to specific portions of the testimony of Mrs. Kaune which he deems incompetent, if her testimony should be again read from the bill of exceptions.

IV. Appellant complains that the court permitted Meadows to testify to conversations between himself and Cotham, not in the presence of defendant, after the fire and, as appellant contends, after the alleged conspiracy had terminated. The only instance of that kind pointed out in defendant's brief, and the one of which, apparently, he complains, occurred at the Westgate Hotel in St. Louis some weeks after the fire. Meadows testified: "'I went over there and I met him (Cotham) coming out of the door, and as he started out, I said, 'Where are you starting?' I said, 'I started to see you.'" At this juncture defendant objected and the objection was overruled. The witness continued:

"A. And he says, 'I just started around to see the party now.' I said, 'Where are you going?' He said, 'Right around the corner here.' 'I'll go with you,' I said. 'Well, maybe he won't want you to.' I said, 'Well, I'll go anyway.' So we went on around there and when we got around he was across the street on this little street; I don't know what little street, it is right east of the hotel; well, I call it east of the hotel.''

They proceeded to the place referred to where they met defendant and the three had a conversation. It appears from Cotham's testimony that this meeting had been arranged by Cotham pursuant to agreement between him and defendant because, he said, Meadows had been hounding him for money and he had so reported to defendant and wanted defendant to meet Meadows and deal with him directly and defendant had authorized him to arrange the meeting. Regardless of whether the conspiracy had ended or not we see nothing prejudicial in this bit of evidence. Whatever damaging statements were made when the three men got together were in a conversation at which defendant was present and, according to Cotham's testimony, defendant had authorized Cotham to arrange for that meeting. If so,—a question for the jury—he is hardly in position to complain.

Appellant also complains of a certain conversation between Meadows and Cotham some two weeks after the fire, testified to by Cotham, at which defendant was not present. This testimony was not objected to until after the question which elicited it had been answered and defendant did not move to strike it out. The objection came too late.

Complaint is made also of the admission of testimony of Meadows and Cotham detailing conversations each of them, respectively, claimed to have had with defendant after the fire, relative to the collection of money from defendant and the payment of money by defendant to Meadows or to Cotham for Meadows, which Meadows was persistently demanding. Proof of these conversations, had with defendant himself, was competent.

V. It is contended that Instruction No. 2 given by the court assumes that there was a conspiracy,—a disputed fact,—and was therefore prejudicially erroneous. The instruction reads:

"The court instructs you that when two or more persons enter into an unlawful agreement or understanding, whether such agreement or understanding be tacit or expressed, to aid and assist each other in the commission of a crime or series of criminal acts, where the crime or crimes contemplated are such that in the prosecution thereof the natural and probable consequences are that human life will be put in jeopardy, and if in the carrying out of such unlawful design a human life is taken by any of the conspirators, each is equally responsible for such killing, even though at the time such understanding and agreement was entered into such killing was not intended or within the contemplation of the parties as a part of the original design."

A like instruction was given in State v. Meadows, supra, and was there assailed on the same ground. Appellant cites that case as authority for his contention here. We did not therein so hold. We dismissed the contention without discussion, stating that if the instruction did so assume it was merely the assumption of an admitted fact, which was true in that case. But that was not a holding that the instruction was bad, and was not so intended. In the instant case the existence of the conspiracy is not an admitted fact. But in our opinion the instruction does not so assume. Its purpose is to explain to the jury the effect of a conspiracy to commit a crime which naturally and probably will jeopardize human life, when such result follows though not actually intended, and the responsibility of each conspirator for acts of the others in carrying out the conspiracy. The instruction does not purport to cover the whole case or direct a verdict. Other instructions required the jury to find that a conspiracy had been entered into. This contention cannot be sustained.

VI. It is urged that the *corpus delicti* was not sufficiently proved. We shall not further lengthen this opinion by detailing the facts and circumstances tending to prove that issue. In some respects the proof, especially as to the incendiary origin of the fire, may not have been as complete and satisfactory as in the Meadows case, but we think it was sufficient, both as to that element and the fact that May Frazer was killed in the fire, to make a submissible case.

Complaint is made of other alleged errors. Some are not substantiated by the record. Others may not and probably will not arise on another trial. For the error herein above noted the judgment is reversed and the cause is remanded. *Westhues* and *Bohling*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.