STATE of Missouri ex Inf. John M. DALTON, Attorney General of Missouri, Relator,

v.

Garner L. MOODY, Prosecuting Attorney of Wright County, Missouri, Respondent.

No. 44717.

Supreme Court of Missouri, En Banc.

June 8, 1959.

John M. Dalton, Atty. Gen., Julian L. O'Malley, Asst. Atty. Gen., for relator.

Wayne T. Walker, Springfield, Claude T. Wood, Richland, Ira H. Lohman, Jefferson City, for respondent.

LEEDY, Judge.

This is an information in the nature of quo warranto brought by the Attorney General in the original jurisdiction of this court to oust respondent from the office of Prosecuting Attorney of Wright County. The proceeding grows out of a grand jury investigation held at the June, 1954, term of the circuit court of that county. Hon. Warren D. Welliver of Columbia was appointed Special Commissioner to take the evidence and report same to the court, together with his findings of fact and conclusions of law, and this has been done. The record returned by him (exclusive of his comprehensive 19-page report, the original exhibits, and his findings of fact and conclusions of law) consists of three bound volumes totaling 830 pages. His ultimate recommendation was that defendant "be discharged, that the order to show cause be quashed, and that the costs be taxed against relator."

On June 8, 1954, under the authority of Section 27.030 RSMo 1949, V.A.M.S., the Attorney General was directed by the then Governor to investigate complaints reaching him, the Governor, of alleged law violations in Wright County, and the alleged failure of law enforcement officials of that county to enforce the laws; to investigate such other complaints of law violations in Wright County as might come to relator's attention, and to present the same to the grand jury then about to be convened in Wright County; and "to render such assistance to the Prosecuting Attorney of such county as such official may see fit to request of you, or to render such assistance in the trial court as may be necessary or required in the premises." Pursuant to such directive, the relator designated two Assistant Attorneys General (one of whom, Mr. Julian L. O'Malley, bore the entire brunt of the assignment) to act for and in his behalf in such matter. Upon communicating that fact to the judge of the Wright Circuit Court, the latter caused to be entered of record an order authorizing such Assistant Attorneys General to aid respondent "in the discharge of his respective duties before the Grand Jury heretofore convened on June 23, 1954, and either or both of said Assistant Attorneys General are hereby authorized to assist in investigation and presentation of evidence before said Grand Jury and are further authorized to sign any indictment returned by said Grand Jury or to file substitute informations for such returned indictments along with the Prosecuting Attorney of Wright County, or to so act in the event the said Prosecuting Attorney becomes disqualified or refuses to carry out the duties of his office."

The grand jury convened on August 9, 1954, and concluded its hearings and deliberations on September 30, 1954. It returned only two indictments (both on August 17), one of which, No. 6494, was against M. J. Huffman, Frank Little and E. L. Colton; and the other, No. 6495, was against Chester Coday. These indictments charged the defendants with having unlawful and felonious possession, on the night of August 5, 1952 (the date of the state-wide primary election) of a sack containing ballots which had been voted in Hart Township in said primary election, and in removing said ballots from the office of the county clerk (their lawful depository) for the unlawful and felonious purpose of having the same destroyed. The indictments are counterparts of each other, except for the transposing of the names of the defendants.

Thereafter, on September 18, 1954, the respondent filed an information in the circuit court against Howard Coday, Chester's nephew (after a preliminary hearing based on the prosecutor's complaint filed August 17, 1954, at which preliminary Howard was bound over), charging him with precisely the same offense as that charged in the two indictments. Howard Coday had testified before the grand jury, and his name was endorsed on both indictments as a state's witness. Chester Coday (who was indicted) had likewise testified before the grand jury, and his name was endorsed as a

state's witness on the Huffman-Little-Colton indictment.

On October 26, 1954, the indictments in the two cases numbered 6494 and 6495 were nol-prossed by respondent (as was the information in No. 6499 against Howard Coday), and this without previous notice to, or knowledge of relator or his assistant. Such nol-prossing of the indictments by respondent constitutes the principal charge of misconduct against him.[1] The other charges have to do with respondent's attitude and conduct before the grand jury, and with his having instituted the case against Howard Coday, to the embarrassment and hindrance of the state in the prosecution of the two indictments, all as hereinafter more specifically detailed.

It was developed at a pre-trial conference that relator's case was dependent, in the first instance, upon evidence whereby the secrecy of the grand jury would be invaded, to the admissibility of which evidence respondent objected. On that pivotal question the Special Commissioner ruled that relator could call either grand jurors or grand jury witnesses to testify, subject to ruling on the relevancy or competency of the questions propounded to them at the time they were called. In consequence of that ruling, and in order to save costs and expedite the hearing (but without waiving respondent's fundamental objection above noted), it was stipulated that "any portion of the transcript of the proceedings before the grand jury may be read in evidence on behalf of relator, or on behalf of respondent, in lieu of actual physical production of the witness or witnesses * * * as to all the proceedings that transpired in the grand jury room," subject to objections thereto on the ground of relevancy and competency.

The state's evidence is comprised in its entirety of portions of the transcript of the grand jury proceedings (testimony of sundry witnesses, discussions in which respondent either participated or was present, and other proceedings), together with certain documentary evidence such as the affidavits of Chester and Howard Coday, certified copies of the record and court proceedings in relation to the foregoing indictments and information and the dismissals thereof. Respondent has kept alive and urges on the present submission his objection to the admissibility of the former. If the Special Commissioner's ruling thereon be reversed or not followed, and such evidence excluded, then, as forecast above, the relator's case would necessarily fall, and so we examine the question of the admissibility of the grand jury proceedings as the issue of first importance.

"It has long been the policy of the law, in furtherance of justice, that the investigations and deliberations of a grand jury should be conducted in secret, and that for most intents and purposes, all its proceedings should be legally sealed against divulgence." 24 Am.Jur., Grand Jury, § 47. The rule is based on common law and statutory authority. The oath of grand jurors as prescribed by § 540.080 (all statutory refer-

1. The information charges that such indictments were nol-prossed "when Respondent had full and complete knowledge of the incriminating testimony given by the State's witnesses before the Grand Jury which returned the indictment in such cases and which testimony was known by Respondent to have been given by witnesses who were willing to voluntarily incriminate themselves before a Grand Jury or be in the alternative position of falsely swearing before a Grand Jury if they later changed their testimony in the trial of such causes; that possession of such knowledge on the part of Respondent at the time he filed his nolle prosequi in the cases colors his action with bias and prejudice against the State of Missouri and Relator respectfully suggests that in exercising his discretion to enter nolle prosequi in such criminal proceedings Respondent was misusing and abusing his official discretion in such a manner as to cause him to forfeit his right to the office of Prosecuting Attorney of Wright County, Missouri, and such office should be declared by this Court to have been forfeited and vacated from the time Respondent entered his nolle prosequi in the beforementioned criminal cases on October 26, 1954."

ences are to RSMo 1949 and V.A.M.S., unless otherwise noted) is that, among other things, "the counsel of your state, your fellows and your own, you shall truly keep secret."

Other statutes declare exceptions to the rule of secrecy:

§ 540.320. "No grand juror shall disclose any evidence given before the grand jury, nor the name of any witness who appeared before them, *except when lawfully required to testify as a witness in relation thereto; * * *.*"

§ 540.300. "Members of the grand jury may be required by any court to testify whether the testimony of a witness examined before such jury is consistent with or different from the evidence given by such witness before such court; and they may also be required to disclose the testimony given before them by any person, upon a complaint against such person for perjury, or upon his trial for such offense."

§ 540.110 prescribes the oath for grand jury witnesses (in addition to the usual oath), as follows:

"You do further solemnly swear, or affirm, that you will not after your examination here, directly or indirectly, divulge or make known to any person or persons the fact that this grand jury has or has had under consideration the matters concerning which you shall be examined, or any other fact or thing which may come to your knowledge while before this body, or concerning which you shall here testify, *unless lawfully required to testify in relation thereto.*"

The statutes provide criminal penalties for disclosure by either grand jurors (§ 540.320) or witnesses (§ 540.120). The court must instruct the grand jurors on their duties not to make disclosures (§ 540.-330), but they cannot be compelled to disclose their votes nor what opinions were expressed by any juror in relation to any question before them (§ 540.310).

We have in this state a very considerable number of cases involving the rule of grand jury secrecy, and the construction and application of these statutes, among which the Special Commissioner's report discusses or refers to the following: State v. Brewer, 8 Mo. 373; Tindle v. Nichols, 20 Mo. 326; State v. Baker, 20 Mo. 338; Beam v. Link, 27 Mo. 261; State v. Grady, 12 Mo.App. 361, affirmed 84 Mo. 220; State v. Thomas, 99 Mo. 235, 12 S.W. 643; State v. Johnson, 115 Mo. 480, 22 S.W. 463; State v. Cole, 145 Mo. 672, 47 S.W. 895; State v. Faulkner, 185 Mo. 673, 84 S.W. 967; Ex parte Welborn, 237 Mo. 297, 141 S.W. 31; State v. Shawley, 334 Mo. 352, 67 S.W.2d 74; State v. Pierson, 337 Mo. 475, 85 S.W.2d 48; State v. Pierson, 343 Mo. 841, 123 S. W.2d 149; State v. McDonald, 342 Mo. 998, 119 S.W.2d 286; Conway v. Quinn, Mo. App., 168 S.W.2d 445. None of these presented the question here involved, and the Special Commissioner properly so concluded.

The single Missouri case cited by relator is State v. Grady, 12 Mo.App. 361, a decision of the St. Louis Court of Appeals. There the accused had sought to show by witnesses (upon a hearing on his motion to quash) that the grand jury had found the indictment without having any testimony before it. Upon objection by the state, such evidence was excluded, and this was held, on constitutional grounds, to be reversible error. Relator particularly relies on and stresses the following language from that case in so holding:

"The common-law rule of secrecy was formerly enforced with a strictness wholly unknown to the more recent adjudications. It was long held that no one should be heard, under any circumstances, to impeach or impugn the propriety or regularity of a grand jury's proceedings. United States v. Brown, Fed.Cas.No.14,671, 1 Sawy. 531. *But the later doctrine, which recognizes personal constitutional right as superior to every other consideration, is now well established, that, whenever it becomes essential to the ends of justice, or to constitutional supremacy, to ascertain what has oc-*

*curred before a grand jury, it may be shown, no matter by whom; the only limitation being, that it may not be shown how the individual voters voted, or what they said during their investigations."* (Emphasis supplied.)

The judgment of the St. Louis Court of Appeals reversing the Grady conviction for the reason just noted was affirmed on appeal to this court (State v. Grady, 84 Mo. 220), but here the holding was somewhat less broad than that indicated by the quoted language upon which relator relies, in that in this court it was held that the testimony of the *prosecuting attorney* might be received to show that the grand jury had heard no evidence whereon to indict, but that proof of such fact could not be made by a member of the grand jury.

On the other hand, while also citing State v. McDonald, supra; State v. Thomas, supra; Conway v. Quinn, supra, and State v. Cole, supra, respondent relies principally upon Tindle v. Nichols, supra, a case decided in 1855, more than a hundred years ago. In Tindle the court had before it §§ 15 and 17 of Article 3 of the then statutes governing practice and proceedings in criminal cases, which sections are, respectively, our present §§ 540.300 and 540.320. The action was for slander. Defendant pleaded the truth of the words, and that plaintiff's wife, as a witness before the grand jury, did swear falsely in a matter under investigation by the grand jury. Defendant called several of the grand jurors who, over their own objections, and those of plaintiff's counsel, were required to testify in regard to what the plaintiff's wife had sworn to as a witness before them. On appeal to this court, the admission of such evidence was held to be reversible error. The court, construing what are now §§ 540.300 and 540.320, held that the only cases in which a grand juror might lawfully "testify as a witness in relation thereto" as provided by § 17 [§ 540.320] were "such as are embraced in the fifteenth section cited above [§ 540.300], and such only. This fifteenth section specifies these cases, and the bare

specification excludes all other cases not enumerated. These cases are, first, 'Whether the testimony of a witness examined before such grand jury is consistent with or different from the evidence given by such witness before such court; and, secondly, may be required to disclose the testimony given before them by any person, upon a complaint against such person for perjury, or upon his trial for perjury.' "

■ It is apparent that the challenged evidence in the case at bar does not fall within the letter of the statutory exceptions in relation to grand jurors, but this is not fatal; other exceptions to the rule of secrecy have been implied by the courts, including this one, when essential to the ends of justice. This is made plain in the recent case of Mannon v. Frick, 365 Mo. 1203, 295 S.W.2d 158, where, in a damage suit, this court upheld the trial court's ruling in admitting certain evidence of the proceedings before a grand jury. This late case reviewed at length the whole subject of the secrecy of grand jury proceedings and the reasons therefor, and held that the law may, through its constituted tribunals, dispense with the observance of secrecy, and in the furtherance of justice require a witness or witnesses to testify to certain of the proceedings before a grand jury; that such disclosure may be required either in the general public interest or in the protection of private rights, but may not be ordered in contravention of existing statutes (such as § 540.310 forbidding disclosure of votes of grand jurors on any question before them, or what opinions were expressed by any juror in relation to any such question); and that, in such matters as were there discussed, it is for the trial court, in the exercise of a sound discretion, to weigh the reasons for secrecy against need for disclosure, and determine whether under the circumstances the witness should be required to testify. This same decision expressly limits the holding of the Tindle case "strictly to the facts there in judgment."

We shall not undertake to again review the cases relied on by the parties because

**26**

that was done in the Mannon case with the result above mentioned. It was upon an implied exception to the rule of secrecy that the two cases from other jurisdictions upon which the Special Commissioner relied in admitting the challenged evidence were decided. Those cases are Attorney General v. Pelletier, 240 Mass. 264, 134 N.E. 407, and People ex rel. Hirschberg v. Board of Supervisors of Orange County, 251 N.Y. 156, 170, 171, 167 N.E. 204, 210. These cases sought the removal of a district or prosecuting attorney for alleged misconduct in office, and in both it was held that the rule of secrecy did not apply so as to prevent inquiry into their alleged misconduct. The Court of Appeals of New York in the Hirschberg case, citing Pelletier approvingly, said:

"Where a district attorney is charged with official misconduct, the reasons for refusal to apply the rule of secrecy are peculiarly strong. 'He cannot seek shelter behind that rule of secrecy to prevent inquiry into his malfeasance or misfeasance in office. When the reason for the rule of secrecy ceases, the rule itself becomes inoperative. Any other principle would permit a dishonest, corrupt, and vicious district attorney to use the great power of his office and his influence with the grand jury as an engine of oppression, and be entirely safe from inquiry under a seal of secrecy which would prevent investigation. That is not the law. That would be perversion, and not enforcement of the rule.' Attorney General v. Pelletier, 240 Mass. 264, 134 N.E. 407."

■ We have pursued the question far enough to demonstrate that the ruling of our Special Commissioner in admitting the proceedings before the grand jury (none of which fell within the purview of the anti-disclosure provisions of § 540.310) should be, and it is, upheld and approved.

It will be recalled that the two indictments returned by the grand jury were styled "State of Missouri v. M. J. Huffman, Frank Little and E. L. Colton, No. 6494" and "State of Missouri v. Chester Coday, No. 6495." Inasmuch as the principal charge against respondent grows out of his nol-prossing of these indictments, it is well that we first notice the evidence upon which they were returned by the grand jury.

Prior to the convening of the grand jury, both Howard and Chester Coday had on July 13, 1954, given written statements to relator's assistant, Mr. O'Malley, implicating themselves in the commission of the offenses charged in the indictments. Chester's written statement was, in substance and effect, that on the night of the August, 1952, primary election he was on the front steps of the Wright County court house with his nephew, Howard Coday; that he got into Colton's car with Colton and Huffman, and was driven by Colton to the south side of the court house where his (Chester's) pickup truck was parked; that on the trip "around to my pickup" it was agreed that Huffman and Colton would meet him at the Wakefield place, a mile and a half from town; that Huffman and Colton met him at the Wakefield place, as agreed; that Huffman threw the sack containing ballots into the pickup; "they both said to be sure and burn them. I took them home and kept them about two weeks and burned them. These ballots were the ones which had been voted in the circuit judge's election on that day."

Howard Coday's statement went into more detail than Chester's, as will appear from the following copy:

"My name is Howard Earl Coday and my residence is in Wright Co., Missouri. On the night of the August Primary, 1952, at about 12:30 P.M. while standing a little south of the Court House door in Hartville with my wife, Eunice Coday, I was approached by Mr. M. J. Huffman, and he asked me to take my wife home and return as soon as possible—that we are expecting trouble. I got back to the Court House at about 1:00 A.M. and met Mr. Huffman, Frank Little and LaVerne Colton in front of Court House. Mr. Huffman

placed me on the front Court House steps and said watch down [highway] 38, they will be coming at any time. Frank Little went, along with Colton, back into the County Clerk's Office. Huffman walked straight through to Con. Rippee's office. Judge Colton came out the front of the Court House and got into his car on the south side of the Court House, and drove his car at the opening in rock wall at side of jail house & Huffman raised the office window in Con. Rippee's office & then he came out the front door, turned right and went around the Court House. When Huffman got to the back of the Court House just outside of the open window in Con. Rippee's office he hollered to me: 'Nobody back here Coday. Is there anybody coming up 38?' I don't see anybody. I then saw Frank Little come out of the County Clerk's office with a sack which appeared to be stuffed with papers. He took them towards the open window in Rippee's office. I then saw him come back the hallway approaching his office—the County Clerk's office. I then stepped off the front step, turned left to the north and saw Mr. Huffman with a sack, saw him get in Colton's car, along with Colton, and then I went to my car and went home. Chester Coday was on the steps with me while this was going on."

Both Chester and Howard Coday appeared before the grand jury and, signing written waivers of immunity, reaffirmed the facts stated in their respective written statements (both of which statements were before the grand jury), but embellished them by reciting further details. For example, Chester testified that he took the ballots to his home, woke up his wife and they opened the sealed sack that night and found it contained '52 Hart Township ballots which had been voted that day; that Huffman had told him earlier on the night in question, in the presence of Little, "We are going to have to destroy those ballots of Hart Township, but did not say why;" that he kept the ballots about three weeks and about 2 o'clock one morning he burned them, sack and all, in a stove in his home.

Howard was asked these questions before the grand jury, and he made the following answers:

"Q. Did you know at the time you were asked to stand there that you were assisting anyone in the taking of ballots? A. "Well, to say I'd really know it, I didn't, but yes, I had a pretty good idea what they were doing. Not to really say and know, I did not, but I ought to a-knew, just to reason it out I should have, but—* * * As I swore here a while ago, I had a pretty good idea. I did not know, as far as knowin'.'"

Howard's wife, Eunice, (endorsed as a witness on both indictments) testified before the grand jury that Huffman told her husband on the night in question to take her home and for him to come back; that they were expecting trouble. Chester's wife, Susie, (likewise endorsed as a witness on both indictments) in testifying before the grand jury, corroborated Chester as to the fact that when he came home on the night in question he brought with him a sack of Hart Township ballots; that the ballots were taken out of the sack and examined by her and were found to bear numbers, initials and black stickers; that the ballots were around their house for two or three weeks, but she disclaimed knowledge of what became of them, saying she simply "lost track of 'em." Bill Coday, Chester's son, testified before the grand jury that shortly after the primary he was at his father's home and saw the ballots on the bed.

The other state's witness whose name was endorsed on the indictments was former Senator William H. Robinett. The crucial matter in his testimony before the grand jury was that in July, 1953, during the progress of a "P.M.A." election in Wright County, Frank Little came to him and stated that Chester Coday needed protection. The witness asked Little, "What do you mean by protection," in reply to which Little "went on to relate what happened in the court house that [August, 1952] night," saying "they" took the ballots and ballot sack and

returns from Hart Township out the back window and delivered them to Marion Huffman and LaVerne Colton, and that Huffman and Little delivered them to Chester Coday to burn; that witness then "looked Frank right straight in the eye and I told him, I says, 'The boy that needs protection is Frank Little.' I said, 'You're the official custodian of the returns.' "

On October 26, 1954, Howard Coday's counsel filed a motion to quash the information on the ground that "the facts stated in said information do not constitute an offense under the laws of the State of Missouri." On the same day said motion to quash came on for hearing before Hon. James P. Hawkins, sitting as Special Judge of the Wright Circuit Court, and counsel for the accused made an argument thereon which covers some ten pages of the record, at the conclusion of which the following occurred:

"The Court: What do you say, Mr. Moody?

"Mr. Moody: The State has no argument.

"The Court: Would you care to be heard on it, Mr. O'Malley?

"Mr. O'Malley: Your Honor, as representative of the Attorney General's Office, we took no part in the filing of this information. However, it is up to us to cooperate with the Prosecuting Attorney of this county in prosecuting his cases.

"Now a motion has been filed to quash his own information. I feel that the Prosecutor should at least answer the motion.

"The Court: Yes, Mr. Moody, I believe it is your duty to give your view on the motion.

"Mr. Moody: Of course, this information was pretty well a copy of the offense in connection with the indictments. Of course, this was patterned after the other cases, companion cases, in my view, and filed. For that reason I felt that it was a companion case and should be taken up with the others, and personally, I know of no section.

"The Court: Where did you get your information; copy it off of the indictments?

"Mr. Moody: Off of the indictments.

"The Court: Of course, all I know about this, gentlemen, is what I have read in the newspapers. I understand that there are some indictments for the same offense, and that the Attorney General's office was represented before the grand jury, is that correct, Mr. O'Malley?

"Mr. O'Malley: That is correct, Your Honor.

"The Court: Do you know whether or not this information is similar to the indictment?

"Mr. O'Malley: I think I recall having seen it. I believe Mr. Douglas showed me a copy of it, or what purported to be a copy, that bears a great similarity, but I have not prepared it.

"The Court: It seems to be taken from the indictment. I wonder, Mr. O'Malley, as a friend of the Court and as being officially present in behalf of the State in these indictments, if you would care to say anything about what you think of the legality of the indictments.

"Mr. O'Malley: Your Honor, as representative of the Attorney General's office, I hesitate to speak in favor of this information or to speak of the other indictments until such time as a motion to quash has been filed and the State's Attorney has had a chance to prepare his answer to any motion. I really do not feel that I should interfere in this case except for the reason that we are trying to cooperate with the Prosecutor.

"I had no information that he was intending to file this information against a State's witness. So, you see the state of cooperation that is now existing. It makes it exceedingly difficult. So, I ask to be relieved in this particular information. I am only trying to make a record."

After some further discussion the court announced the view that the information charged an offense under § 129.860, and so overruled the motion to quash. Apparently the court then proceeded to call the case involving the Huffman-Little-Colton indictment, No. 6494, whereupon the prosecutor announced that "a nolle prosequi is entered by the Prosecuting Attorney." This took the representative of the Attorney General's office by surprise, and Mr. O'Malley asked that "in the interest of law enforcement and professional ethics" the Prosecuting Attorney disqualify himself, which the prosecutor declined to do. Mr. O'Malley then expressed the view that inasmuch as the Attorney General's Assistant had also signed the indictments with the Prosecuting Attorney, that he felt that the court should not enter a nolle on the sole motion of the Prosecuting Attorney, and asked leave to file a motion to disqualify the Prosecuting Attorney. The court then asked Mr. O'Malley if he had had "any information whatsoever that it was the intention of the Prosecuting Attorney to nolle these cases," to which Mr. O'Malley replied: "This is the first time I have heard of it. Just as before, in the other case, when he came up and filed a motion to disqualify the judge, I didn't know a thing about it." After some further discussion the court gave the Attorney General's office time "to prepare an affidavit attempting to disqualify the Prosecuting Attorney" and set the matter over until November 9.

On the same day the Prosecuting Attorney filed an instrument nol-prossing the Chester Coday indictment, and thereafter the Assistant Attorney General was granted the same leave in the Chester Coday case to file a motion to disqualify the prose-cutor as in the Huffman-Little-Colton case, and all further proceedings in said cases were set over to November 9.

Motions alleging disqualification of the Prosecuting Attorney were filed in due time, and on the date to which said matters had been continued, the court announced that it was of the opinion that the facts recited in the Attorney General's motions "would justify any court in disqualifying" the prosecutor, but that the court was powerless to act because the indictments had been nol-prossed before the affidavits were filed, and therefore the cases were no longer pending. The institution of the present ouster proceedings followed quickly on the heels of that action, to-wit, on November 29, 1954.

As previously noted, no witnesses were orally examined on the part of relator before the Special Commissioner, but the substance of the relevant portions of the grand jury proceedings and those before the court in connection with the motions to quash and the eventual nol-prossing of the indictments (on which relator relies) have been hereinabove sufficiently set forth to give an understanding of relator's proofs.

We turn, then, to the other side of the case where we find that ten persons and respondent himself testified before the Special Commissioner in respondent's behalf. Six of these witnesses (the director of welfare in Wright County, a conservation agent in Wright County, an agent for the Missouri Department of Liquor Control, a sergeant in the State Highway Patrol, the sheriff of Wright County, and a county judge) testified generally to the fact that respondent had, as prosecuting attorney, cooperated with them, respectively, in the performance of their duties. They did not purport to know anything about the specific matters upon which the present proceedings were based. Another group (four in number) had been election officials in the Hart Township precinct at the August, 1952, primary, and each of them disclaimed having seen or having any knowledge of any ir-

regularities in the voting throughout that day. The remaining witness other than respondent was Olath Herman Chapman, the custodian of the court house. He testified that he had been so employed for over seventeen years, and that he was on duty during the years 1952, 1953 and 1954; that in August, 1953, he burned all the ballots for the primary election held in Wright County in August, 1952, including those for Hart Township; that he burned them at the expiration of a year and a week or ten days after the election was held, and he did so under the direction of Frank Little, the county clerk; ·that the ballots were in the county clerk's vault, and as he, the witness, carried the sealed bags out of the vault, Frank Little checked them to see that he had the right ones, and that the Hart Township ballots were among them; that when he had carried them all out, he got a five-gallon can of coal oil, took all of the ballots to the south side of the court house lawn, poured the five gallons of coal oil on them and set them afire; that he had a big long pole with which he stirred them "until you couldn't tell what it was—only just a bunch of burned paper;" that he had followed this procedure after each election since he had been custodian of the court house. The witness further testified that after the indictments in question were returned, he talked to respondent several times about the matter, during the course of which conversations respondent would ask if witness was sure that the Hart Township ballots were there, if witness checked them out and burned them, and witness assured him that he did.

Taking the witness stand in his own behalf, respondent testified he had lived in Wright County since he was eight months old; he was then thirty-two years of age, married and the father of two small sons; that after serving thirty-nine months in the Navy he entered Southwest Missouri State College at Springfield, where he completed two years of pre-law education, and thereafter attended the School of Law of the University of Missouri, from which he was graduated in 1950; that in the fall of that year he was elected prosecuting attorney of his county, and reelected in 1954. As a part of his testimony, respondent read a prepared statement (covering more than 20 pages of the transcript) setting forth his reasons for having nol-prossed or dismissed the two indictments in question, which statement, as summarized in respondent's brief (with certain editing on our part), follows:

One, he was reared in the community with the two Codays and was well acquainted with what he characterized as their "vindictive traits and their little regard for truth and honesty." He took into consideration that the witnesses who testi-·fied before this grand jury, and those pertaining to the case, were defeated candidates in the primary election of 1954 or members of their immediate families. Second, Olath Chapman, jailer and janitor at the court house at Hartville would have testified, according to his statement to respondent, that he and the County Clerk, .about the middle of August, 1953, burned (among others) the ballots in question.

Three, respondent, present at the taking of the depositions on October 22, 1954, heard the testimony of witnesses, including that of Chester Coday and Howard Coday, which testimony was contradictory, as he contended, in the several respects pointed out by him, covering 7 pages of the transcript. (Respondent said he also took into consideration that neither the Codays nor Mr. W. H. Robinett made any complaint until the 1954 primary election was in full swing, at which election Robinett and both Codays were candidates.)

Fourth, respondent testified that he had a strong reason to believe, especially after hearing the testimony of the Circuit Clerk and an associate Judge given at the depositions, that the grand jury list was prepared by political enemies of the three persons indicted in case No. 6494. Respondent then enumerated the things which caused him to believe that· the grand jury list was thus prepared.

Five, respondent said that Mr. Huffman, Judge Colton, and Frank Little were "reputable, outstanding civic and political leaders in Wright County, Missouri, and had been for many years. I knew that Mr. Huffman was an outstanding lawyer in this area; that he was Prosecuting Attorney of Wright County for ten years from 1935 to 1944; that his reputation for a vigorous law enforcement officer during that period of time was of the very highest; that he had served at least one term in the Missouri Legislature;" that he was a member of certain fraternal organizations (naming them); that he had been a long time member of the Chamber of Commerce of Hartville, and had served several years as a member of the Board of Education of the Hartville School District; that he was a life long resident of Wright County, Missouri, and had never been arrested in his life.

Respondent testified that Judge Colton had been Probate Judge for many years; that he had been Probate Judge and Magistrate Judge since the new constitution took effect; that he knew his church and fraternal affiliations; that he was in the armed forces and served several months overseas in World War II; that he had been a member for several years of the Hartville Chamber of Commerce; that he had been a member of the Hartville Board of Education; that he was a long time resident of Wright County, Missouri, and that he had never been arrested in his life.

Respondent testified that Frank Little was a life long resident of Wright County, had never been arrested in his life; had served in the armed forces; had spent several months overseas; that he had been the County Clerk since 1947 and had just been renominated for his third consecutive term; and that he was a member of the Masonic Fraternity, including the Shriners.

Respondent testified he knew it would be impossible to convict those men in Wright County, or anywhere for that matter, unless evidence was clear, unprejudiced and reasonable.

Sixth, respondent testified he could see no motive for the alleged crime, as the testimony of the witnesses indicated that the election was honest, and that all the proper returns were turned in and everything was conducted properly on the date of the election.

Seventh, respondent testified he discussed the matter with many prominent citizens of Wright County from all over the county, of both political faiths, after these indictments were returned, and that the great majority of them had informed him that in their opinion these indictments were politically inspired; that the grand jury had been picked for the purpose of indicting Huffman, Little and Colton; and that the witnesses were angry because of political reverses and would swear anything, and that in their opinion these three men were innocent, and that it would be useless to try them, that it would be a great expense to the state, and that they would all come clear.

Eighth, respondent testified he was convinced that, if any crime had been committed by the defendants, it was a misdemeanor and would have been barred by the statute of limitations. He testified that the foregoing facts and circumstances and reasons which he had detailed constituted the sole and only reason for his dismissal of the criminal actions. Respondent testified he was not possessed of any motive, bad or otherwise, in dismissing these charges other than the reasons which he had detailed in evidence. He testified he did not have any obligation to any of the defendants to such an extent that he felt he would have to dismiss the indictments. He testified he did not have any interest himself other than to exercise his sole legal discretion.

Respondent gave as further reasons for dismissing the cases against Chester and Howard Coday that Mr. Elvin Douglas had told respondent that Douglas was employed to represent the Codays; that Douglas had talked it over with the Codays; that he was going to do his best to keep the two

Codays from being convicted, and that Douglas had indicated that the Codays would not take the stand. Respondent said he knew that a confession by itself without proof of the corpus delicti was not sufficient for a conviction. Respondent said that he did not file charges against Howard Coday to embarrass anyone but respondent felt that Howard Coday had been involved as much as any of the rest according to his own statements, and that the respondent had never made it a practice to turn anyone free to testify against someone else.

■ This opinion could be extended indefinitely by reciting the myriad of interesting collateral matters that appear in or are fairly inferable from the record but which are without controlling force on the issues presented. The setting of the grand jury was clearly one marked, as the trial court said in charging it, by a background wherein animosities were running deep as a result of the primary election which had just been held. Political overtones and high personal feelings seem to have been present in all of the activities out of which the prosecutions arose. Under the law, respondent, as prosecuting attorney, had sole discretion to nolle the indictments, and it is not contended otherwise. State ex rel. Griffin v. Smith, 363 Mo. 1235, 258 S.W.2d 590; State on Inf. McKittrick v. Wallach, 353 Mo. 312, 182 S.W.2d 313, 155 A.L.R. 1. The question then arises as to whether respondent, in dismissing the indictments, wilfully and wrongfully abused his discretion so as to have thereby forfeited his office. The Special Commissioner, whose opportunity for judging the credibility of the witnesses is far superior to our own (on the cold record), heard the prosecutor's explanation, and accepted it, or enough of it whereon to conclude that although unwise and in poor taste, his action in dismissing the indictments was within his discretionary power. In so doing he considered the youth and inexperience of the prosecutor and the political atmosphere attending the events complained of. Similar considerations lead us to defer to his finding, and we therefore reach the same conclusion with respect to the nol-prossing of the indictments. We agree with the Special Commissioner that a far wiser course would have been to have fully and publicly aired the matter by trial, and either vindicated the accused persons and the election processes in Wright County, or let the chips fall where they might.

■ What has just been said applies with equal force to the charge that the prosecutor's action in charging Howard Coday by information with the same offense as described in the two indictments embarrassed the state and interfered with the orderly prosecution of said indictments; that is to say, the Special Commissioner, in weighing the evidence, accepted the respondent's explanation of his reason for having proceeded against Howard Coday when he did, and his claimed want of intent to embarrass or hinder the prosecution of the indictments in so doing. Here again there would seem to be no doubt of the fact that such action was in poor taste, and indicated a marked want of cooperation with the Attorney General's office. Nevertheless, we think this transgression was not such as worked a forfeiture of office, and we so hold.

■ The other complaint is that the prosecutor used the grand jury room as a trial forum, and this is based on the fact that he called before the grand jury Frank Little, the county clerk, who was subsequently indicted, and elicited from him testimony as to his handling of the ballots in the 1952 primary. While this was indiscreet, under the surrounding circumstances, we do not regard it, standing alone, as having operated as a forfeiture of his office.

From what has been said it follows that ouster should be, and it is, denied.

All concur.